C. A. Sorensen, appellant, v. Richard F. Wood et al., appellees.

Filed June 10, 1932.   No. 28107.

*Perry, Van Pelt & Marti,* for appellant.

*Max V. Beghtol, Glen H. Foe, J. Lee Rankin* and *Fred C. Foster, contra.*

*Lawrence Vold, amicus curiæ.*

Heard before Goss, C. J., Rose, Dean, Day and Paine, JJ., and Horth, District Judge.

Goss, C. J.

C. A. Sorensen, who was a candidate for reelection as attorney general, brough this action for $100,000 damages against Richard F. Wood, who was the speaker, and against KFAB Broadcasting Company, owner and operator of the station over which the speech was broadcast from Lincoln. The jury found in favor of plaintiff as against Wood, assessing damages at one dollar, and found in favor of defendant company. Judgment was entered on the verdict against Wood for one dollar, absolving the broadcasting company from liability and awarding it execution for its costs. Plaintiff appealed.

The petition charged that, about 6:30 p. m., on August 11, 1930, being the evening before the Nebraska primary election, certain false and libelous statements, concerning plaintiff, contained in an article composed and broadcast by Wood, were published and circulated to a large radio audience by means of machinery and equipment supplied by defendant company; that a copy of Wood's address was available for use of the company before its publication over the radio, that a representative of the company introduced and vouched for Wood, was present and heard him read the article and thereby adopted and published said statements; that in the course of reading and publishing said article and, with the intention of injuring plaintiff in his profession and, reputation, and for the purpose of making his election to the office of attorney general more difficult, defendants did maliciously publish the following language:

"In his (the plaintiff's) acceptance of the attorney general's office he took an oath before God and man that he would uphold the law justly and honestly. His promises to man are for naught and his oath to God is sacrilege, for he is a nonbeliever, an irreligious libertine, a mad man and a fool."

To show other things contained in the article, together with their connection and innuendo, as alleged by plaintiff, we reproduce three other paragraphs of the petition:

"7th. That in the same article, the defendants, with the same intent and purpose, did maliciously write, read and publish of and concerning the plaintiff, the following language: 'If you see fit to reward me for my efforts for clean government, I will serve you and every section of this state as fearlessly as I have in my dealing with the Judas Iscariots of our state and party,' meaning and giving his hearers to understand that this plaintiff was guilty of treachery, unfairness, baseness, avarice and dishonesty, and that this plaintiff had the attributes of Judas Iscariot.

"8th. That this plaintiff as a part of his official duties as attorney general of the state of Nebraska had prepared, prior to August 11th, an opinion for the use of the secretary of state declaring that the purported filing of George W. Norris of Broken Bow, Nebraska, for nomination on the Republican ticket as United States senator from Nebraska was ineffective, out of time and unlawful; that the defendants, well knowing said facts, nevertheless in said article so composed, written and read after referring to the filing of the said George W. Norris of Broken Bow, and with the same aforesaid intent and purpose, did maliciously write, publish and read: 'It was the act of Sorensen,' meaning, inferring, and giving his listeners to understand that plaintiff had induced and secured the filing of the said George W. Norris of Broken Bow, and then had publicly attacked the validity of that filing, thus using his office and position for the dishonest purpose of deceiving and defrauding the people whom he was elected to serve.

"9th. That the plaintiff as attorney general of the state of Nebraska and as a part of his duties as such official had applied for and secured temporary injunctions against certain gambling places in Omaha, Nebraska, all of which was well known to the defendants and the electors of the state of Nebraska; that the defendants in the aforesaid article maliciously wrote, published and read the following language, with the aforesaid intent and purpose: 'Attorney General Sorensen made public appeal to you on his record of law enforcement. Let me tell you the inside story of his law enforcement in Omaha. You have heard of his injunctions in Omaha. You will remember that his assistant, Mr. Stalmaster, of Omaha, applied for temporary injunctions against gambling places, one of which was run by Gene Livingston, the alcohol baron. Well, these injunctions have not been called up for hearing. They are *"statu quo"* because of failure on the part of Stalmaster and Sorensen to prosecute them. This, then, explains the big gambling racket

of Mr. Sorensen, for while these applications for injunctions are pending, the police of Omaha are helpless in stopping the gambling in these places for they are under the supervision of the attorney general by his having an application on file asking temporary injunction against them. It would be interesting for you to know *how many* of these buildings harboring gambling houses affected by Sorensen's application for injunctions are owned by Mr. Lapidus of Omaha, the father-in-law of Mr. Stalmaster, who is Sorensen's assistant and who is handling the Omaha end of the Sorensen racket,' meaning, inferring, and giving the listeners to understand that the plaintiff, in violation of his duty and his oath as attorney general of the state of Nebraska, was protecting the gambling interests in Omaha, and was himself a grafter and engaged in the gambling 'racket' or business in said city, and was using his high office to secure temporary injunctions which he then failed to call up for hearing in order to prevent interference by Omaha police with plaintiff's graft and gambling business."

Plaintiff negatived the truth of the foregoing statements and inferences against him, alleging their damaging effect upon him and his reputation and praying judgment against defendants and each of them.

The defendants answered separately. Wood admitted the corporate existence and description of the equipment, functions and nature of service of the company and generally denied the rest of the petition. The company made like admissions and denial, alleged a misjoinder of defendants, pleaded that it was a common carrier of intelligence by wire and wireless under the interstate commerce act, duly licensed and subject to the regulation of the federal radio commission; pleaded general order No. 31 of the commission, dated May 11, 1928, providing that, in broadcasting material for candidates for public office, "such licensee shall have no power of censorship over the material," and that equal opportunities must be afforded legally qualified candidates for any public office in the use

of such broadcasting station; that Wood was a candidate for railway commissioner. George W. Norris (then and now United States senator) and W. M. Stebbins were candidates for the Republican nomination for the office of United States senator; that Senator George W. Norris had been permitted to use the broadcasting station to promote his candidacy, and so on August 11, 1930, this defendant permitted W. M. Stebbins to do likewise, and Richard F. Wood was presented by Stebbins to speak on his behalf and was permitted to do so; that this defendant had no knowledge in advance of its utterance as to what the speech was to be except that it was to be a political speech in favor of Stebbins against Senator Norris, nor did this defendant or its agents hear that part of the speech alleged as slanderous, libelous and defamatory, nor did it have any power to censor the speech; that plaintiff had been furnished a copy of the speech in advance, knew its context, was possessed of full knowledge of Wood's intention to utter its words over the radio, gave no notice to either Wood or this defendant of any objection and so is estopped to claim damages; that said words were privileged and invited by plaintiff; that this defendant's first knowledge of any objection by plaintiff was not had until about 11 a. m. the next day, whereupon it announced over its broadcasting station four times that afternoon a statement fully set out in the answer, describing the situation and advising its listeners that it was not in sympathy with and did not in any way ratify or sanction the statements made by Mr. Wood concerning the attorney general. Plaintiff's reply fixed the issues. The motion for new trial, which was overruled, and the errors assigned, contain certain issues which will be discussed.

In the reply of plaintiff, traversing the allegation of the defendant company that it had no knowledge in advance of Wood's speech as to what the speech was to be except that it was to be a political speech in favor of Stebbins as against Norris, plaintiff alleged that, while

the libelous statements were being broadcast, the defendant company "negligently failed to use the lever provided to prevent the publication of false and defamatory statements, and negligently failed to stop said broadcast, but maliciously assisted and enabled the defendant Wood to circulate and publish the false, libelous and defamatory statements set forth in plaintiff's petition." This suggestion by plaintiff of the idea of negligence afforded opportunity to defendants throughout the trial and in the argument to treat of the action as if one of damages for negligence. We do not think this phase of the reply amounted to a plea or confession that plaintiff's action was grounded on the theory of negligence. The underlying basis for liability is libel, and not negligent conduct.

The radio address was written and read by Wood. It was heard by witnesses in the studio and by radio listeners. It was taken down in shorthand by an expert reporter, who was listening in at Omaha and was read in evidence from her shorthand notes. A carbon copy of the address prepared by Wood was duly received in evidence. The address, as broadcast, contained the words set forth in the petition. The testimony of other witnesses proved the innuendo and connected the words with the facts alleged in the petition and heretofore quoted. It was shown that, while defendant company did not require and did not have a copy of the speech in advance of its utterance, yet its employees in charge of its station did not use or attempt to use means to stop or shut off the speech, though that could have been done instantly by mechanism which was a part of the equipment. The evidence shows that the announcer, who introduced the speaker, though present, did not pay any attention to the address and did not know the words used by the speaker.

The plea of defendant company that the words used by Wood were privileged appears to be based upon the theory that Wood's speech could not be censored because made on behalf of Stebbins, a candidate for senator, who had to be granted the right to speak or to have a speech

made favoring his candidacy; Senator Norris having previously spoken over the same station in promotion of his own candidacy. The argument on which this theory is based is sought to be derived from section 18 of the radio act of 1927 (44 U. S. St. at Large, 1170) and from order No. 31 of the federal radio commission, dated May 11, 1928, reproducing the section providing that, when equal opportunity is granted to legally qualified candidates for public office to use a broadcasting station, the "licensee shall have no power of censorship over the material broadcast under the provisions of this paragraph." We do not think congress intended by this language in the radio act to authorize or sanction the publication of libel and thus to raise an issue with the federal constitutional provisions prohibiting the taking of property without due process or without payment of just compensation. Const. Fifth Amendment. This is particularly true where any argument for exercise of the police power and for any public benefit to be derived would seem to be against such an interpretation rather than to be served by it. So far as we can discover, no court has adjudicated this phase of the statute and order. We reject the theory. For the purposes of this case we adopt an interpretation that seems in accord with the intent of congress and of the radio commission. We are of the opinion that the prohibition of censorship of material broadcast over the radio station of a licensee merely prevents the licensee from censoring the words as to their political and partisan trend but does not give a licensee any privilege to join and assist in the publication of a libel nor grant any immunity from the consequences of such action. The federal radio act confers no privilege to broadcasting stations to publish defamatory utterances.

Elaborate briefs, containing many citations, have been printed by the parties. One has been filed, as friend of the court, by Lawrence Vold, a professor of law in the state university, who has long taught the course on torts and whose brief concerns itself with a scholarly analysis

of the facts and of the law of libel as presented in this unusual case.

We think there is nothing fundamentally new in the applicable law and therefore shall content ourselves with few citations. There can be and is little dispute that the written words charged and published constitute libel rather than slander. The defendant Wood seems satisfied with the judgment. The defendant company having won is interested only in having the judgment sustained. The plaintiff assigns various errors, chiefly based on instructions given and refused by the court, and asks a reversal as to both defendants.

To quote the instructions complained of would unduly prolong this already extended opinion. We think they can be sufficiently abstracted to indicate the points to be decided. In No. 7 the court instructed the jury that the evidence failed to show any malice of the company toward the plaintiff and that only such parts of the statements made by Wood as are libelous *per se* could be considered against the company. The instruction thereupon told the jury that only two parts of the statement alleged are libelous *per se* and quoted them: First, the one consisting of the group of words describing plaintiff as a "libertine," and, second, the one describing his so-called "racket" in connection with law enforcement in Omaha. In instruction No. 8 the court told the jury that the other alleged libelous statements were to be considered by them in connection with the case against Wood only. By instruction No. 8½ the jury were told that a broadcasting company failing to "honestly and in good faith exercise due care and, on account of that failure," permitting matter libelous *per se* to be broadcast, is responsible for the natural and proximate results of that failure. Instruction No. 9 told the jury that, "in determining the question as to whether these statements last referred to are libelous," they were to consider the entire speech, giving it the natural interpretation of the average man or woman and "then determine under the facts shown in evidence and

the law as given you in these instructions whether these statements contained in the matter broadcast are libelous." (Note: It may be that the court intended No. 9 to refer back to the statements considered in No. 8 rather than in No. 8½, but the record does not so show.)

It is thus readily apparent that the instructions were contradictory and confusing. They first advised the jury that certain parts of the Wood's speech were "libelous *per se*," and then, by instruction No. 9, told them that, in determining whether the "matter broadcast is *libelous*," they were to consider the entire speech, applying the understanding of the average man. It is quite likely the jurors did not understand the language or the significance of the phrase *"per se"* and believed the court was leaving to them the duty of deciding whether *any* of the material broadcast was libelous; and even if they understood that some of the words were libelous *per se*, they were told in effect that, if the station owner honestly and in good faith exercised due care, he is absolved from liability for transmitting unprivileged defamatory words uttered by a speaker. It has often been held in newspaper publication, which is closely analogous to publication by radio, that due care and honest mistake do not relieve a publisher from liability for libel. In *Peck v. Tribune Co.*, 214 U. S. 185, Mr. Justice Holmes said: "If the publication was libelous the defendant took the risk. As was said of such matters by Lord Mansfield, 'Whatever a man publishes he publishes at his peril.' " In *Taylor v. Hearst*, 107 Cal. 262, where the published article was libelous *per se* but the publisher made a mistake in the initials and intended the article to apply to another person, it was held: "Whether such publication was by design, or was the result of carelessness in setting the type, is a matter of no consequence so far as the question of actual damages is involved." In the argument in *Walker v. Bee-News Publishing Co.*, 122 Neb. 511, are cases to the same effect. So the instructions were erroneous in not clearly and unequivocally defining the libelous *per se* statements

as such. The court also erred in submitting the case to the jury by instruction No. 8½, as if the law of negligence and not the law of defamation were the underlying basis for liability of radio broadcasting licensees for the publication of defamatory utterances by radio. These errors were prejudicial and require a reversal of the judgment.

The defendant company, like most radio broadcasters, is to a large extent engaged in the business of commercial advertising for pay. It may be assumed this is sufficient, not only to carry its necessarily large overhead, but to make at least a fair return on its investment. For it appears that the opportunities are so attractive to investments that the available airways would be greatly overcrowded by broadcasting stations were it not for restriction of the number of licensees under federal authority. Such commercial advertising is strongly competitive with newspaper advertising because it performs a similar office between those having wares to advertise and those who are potential users of those wares. Radio advertising is one of the most powerful agencies in promoting the principles of religion and of politics. It competes with newspapers, magazines and publications of every nature. The fundamental principles of the law involved in publication by a newspaper and by a radio station seem to be alike. There is no legal reason why one should be favored over another nor why a broadcasting station should be granted special favors as against one who may be a victim of a libelous publication.

The defendant company alleged a misjoinder of parties defendant. The publication of a libel by radio to listeners over the air requires the participation of both the speaker and the owner of the broadcasting station. The publication to such listeners is not completed until the material is broadcast. As they must cooperate to effect the publication of the libel there cannot be said to be a misjoinder when they are sued together for damages resulting from their acts.

The company also alleged that it was a common carrier of intelligence by wire and wireless within the meaning of the interstate commerce act. This has never been decided by any court. We know that licensees of broadcasting stations in their annual meetings and eminent counsel have taken the opposite view; and that in 1929 the American bar association adopted a resolution instructing its committee on radio law to oppose the enactment of any legislation declaring broadcasting stations to be common carriers or, as such, subject to a common carrier obligation with respect to the transmission of communications. 54 Am. Bar Ass'n Rep. (1929) 90. We are of the opinion that the defense of the company that it is a common carrier is not available here.

Other assigned errors are discussed in the briefs, but we do not think it necessary to discuss them, as under the principles announced here they are not likely to occur in another trial. The errors committed were prejudicial to the plaintiff and favorable to both defendants. The judgment of the district court is reversed and the cause is remanded.

REVERSED.