Summit Hotel Company *v.* National Broadcasting Company, Appellant.

Argued May 9, 1939. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John O. Wicks,* of *Weller, Wicks & Wallace,* with him *A. L. Ashby,* and *Robert R. Wertz,* for appellant.

*A. M. Oliver,* with him *Walter L. Dipple,* of *Dipple & Oliver, John E. Laughlin* and *Morris Zimmerman,* for appellee.

*Wm. A. Schnader,* for intervenor.

OPINION BY MR. CHIEF JUSTICE KEPHART, September 8, 1939:

The National Broadcasting Corporation rented its facilities to the J. Walter Thompson Company, a commercial advertising corporation, for the transmission of a series of sponsored radio programs over one of its networks, comprising 26 stations. The series was sponsored by Shell Eastern Petroleum Products, Inc. The principal performer on the programs was Al Jolson, a comedian. All of the participants, including the announcer, were employed and paid directly by the advertising company. A script for each program was prepared in advance, submitted to the broadcaster, and followed exactly by the performers at rehearsals in the broadcasting studio, where it was approved. The script for June 15, 1935, called for an interview by Jolson with the winner of an annual golf championship. In broadcasting from defendant's studio in Radio City, New York, Jolson, when the program was one-half or two-thirds completed, suddenly interpolated an extemporaneous remark. In response to the golf champion's statement that he secured his first job at the Summit Hotel, Uniontown, Pennsylvania, Jolson said: "That's a rotten hotel."[1] The interjected remark was made without warning; it did not appear in the script, had not been made at rehearsal, and defendant did not know the words were to be used. Present in the studios were

---

[1] The exact statement was as follows: "But tell me Sam, what did you do after you got out of college?" Answer: "I turned golf professional and in 1932 I got a job at the Summit Golf Club in Uniontown, Pennsylvania." Jolson replied "That's a rotten hotel."

defendant's production director and the Thompson program director; neither had an opportunity to prevent the interjection.

An action in trespass for defamation was brought to recover damages for injury to the hotel's reputation and business. No substantial attempt was made to show special damages, and the trial judge instructed the jury that the remarks were "slanderous per se." The lessor broadcasting company was held liable for damages in the sum of $15,000, as awarded by the jury. Motions for new trial and judgment n. o. v. being refused, this appeal followed.

The important question raised is whether a radio broadcasting company which leases its facilities is liable for an impromptu defamatory statement, interjected "ad lib." into a radio broadcast by a person, hired by the lessees, and not in the employ of the broadcasting company, the words being carried to the radio listeners by its facilities.

Although foreshadowed in one or two decisions and articles, this problem is unique; it is the first time the precise question has come before an appellate court in the United States or England. The law of defamation by radio is very much in its infancy, though there have been a few cases involving the liability of a broadcasting station or company therefor. But the situations involved in those decisions differ vastly from that which is before us.

The court below held that defendant's liability was absolute though it was without any fault. The fact that it rented its facilities to another to publish and disseminate a nondefamatory program, and that the defamatory interjection was spoken by lessee's employee under circumstances which precluded anticipation or prevention by the broadcaster, was treated as immaterial.

Appellant urges that to impose such liability for acts of the lessee upon a lessor who is utterly without

fault, in no sense guilty of any wrong or negligence, is not only contrary to the common law but sets up a rule of liability that has never before existed.

The feature which distinguishes this case from the many cases cited for so-called liability without fault, is that here the broadcasting company rented its facilities to the advertising agency to broadcast a legitimate program. For this purpose the facilities were under the control of the agency. Appellant's program director could not have prevented the utterance by lessee's performer because of its suddenness; the supervision he exercised was merely to see that the facilities carried the program contained in the script. The duty of the monitor in the control room was to modulate and correct vocal sounds, and secure the audible transmission of intelligible, harmonious speech; he was, to this extent, as much a part of the rented facilities as the broadcasting equipment itself. His duty being to see that the program was produced clearly to the public over the air, he would be unable to exclude or eliminate a brief defamatory interjection, not only because of its suddenness, but also because his time is fully occupied with the technical details of his work. Moreover, it would require an expert in law to detect in extended remarks what was, or was not, defamation. In view of the positive assertion that, notwithstanding these circumstances, the broadcasting company is absolutely liable without fault, it will be necessary to examine the theory of absolute liability and the subjects to which it has been heretofore applied, so as to ascertain whether it is appropriate in this new form of defamation.

Some writers have traced the origin of liability without fault to an ancient principle that every wrong must have a remedy, and therefore it is urged that the doctrine is not new to the law of torts, in many phases of which it may be found today. Others, on the contrary, have stated that the judicial determination that there may be liability without fault cannot, in strict reason-

ing, be applied to tort law, which is grounded in intentional wrongful conduct or negligence, but that it, rather, assumes an independent sphere of compensation for injurious acts. The confusion of concepts has come about through the extension of the principle of liability without fault covering injuries to land or to rights in land, to tort liability to persons. Distinguished legal scholars, however, have pointed out that the rule of absolute liability persists in several actions, generally included in the field of tort law, such as trespass q. c. f., trespass for nuisance and trespass for injuries caused by wild or domestic animals known to be dangerous, as well as some others which will be touched on later.

In our State, the doctrine of absolute liability has been invoked, almost without exception, only in that small group of actions which redress injuries to land, and it is only as to these that it can be fairly said that the doctrine prevails. This liability is a survival of the medieval law dictated by the landlord, in which the protection of the uninterrupted enjoyment of real property was a primary consideration.

In the very earliest times, all rights, real and personal, were probably entitled to absolute protection, and every injury redressed regardless of fault,[2] but a sharp line of distinction has since been marked between liability for injuries to land and injuries to persons.[3] The case of injuries to land may now be said to be the gen-

---

[2] The plaintiff under these cases was not required to prove any intent, moral culpability or carelessness and the injuror could not escape liability by showing he acted with the utmost care. The case frequently referred to is the decision in 1466 in Y. B. 6 Edw. IV. 7, 18. See Holdsworth, A History of English Law (4th Ed.) Vol. III, pp. 375-382.

[3] In *Weaver v. Ward* (1616), Hobart 289, the modern principle of liability for personal injuries was laid down. It was there stated the defendant may escape liability for causing personal injury where the harm "may be judged utterly without his fault." See Bohlen, Studies in the Law of Torts, 366; Wigmore, Responsibility for Tortious Acts: Its History, 7 Harv. L. Rev. 315.

eral exception to the modern rule that liability will not be predicated on innocent and diligent conduct. A tort today implies fault or wrong. Tort liability must be founded upon some blameworthy conduct, or lack of due care resulting in the violation of a duty owing to others.

It was in the Nineteenth Century that the law of negligence in torts had its development. Personal-injury cases then consumed the greater portion of the time of the courts. Cases concerning rights in land yielded their earlier prominence, and the rules of law applicable to them have consequently remained, in the most part, unchanged, even to the present day.

In Pennsylvania, the principle of liability without fault for injuries to the person has received scant consideration. The great body of our law of liability for personal injuries is that of liability through fault; liability based almost exclusively on wrongful conduct. There is, therefore, no proper analogy between the cases of liability without fault for injuries to land and those for personal injuries where fault must be present.

Illustrating the definite trend of judicial decisions in this State to restrict liability without fault to cases affecting land, and, even there, to narrow its application, we may cite the following cases: We have held that the duty of lateral or subjacent support is limited to land in its natural condition, and it is not extended, unless the actor is guilty of negligence or wilful misconduct. In *Malone v. Pierce*, 231 Pa. 534, we held that one who, in the exercise of his property rights, injures his neighbor, is liable in damages for wilful, wanton, or negligent conduct, saying at page 537: ". . . The right to lateral support is limited to land in its natural condition . . ." See also *Home Brewing Co. v. Thomas Colliery Co.*, 274 Pa. 56, at page 60. The right of lateral support is incident to land: *McGettigan v. Potts*, 149 Pa. 155.

We find the germ of antecedent wrong even in our cases where "liability without fault" is invoked for injury to land, or to rights growing out of land. Intrusions upon land by persons, animals, or substances cast thereon, usually involve intentional or negligent invasion of the close. The law, recognizing the natural tendency of cattle to stray, imposes a duty on the possessor to keep his flock from another's land or to answer in damages. See *Barber v. Mensch,* 157 Pa. 390; *Teller et ux. v. Hood,* 81 Pa. Superior Ct. 443, 445. Here it would seem that the rule is not "absolute liability," but that there is a duty to conform to a high standard of care. There is no case in this State where the owner of cattle has been held liable for damages caused by them where he built and maintained an adequate fence which was destroyed through no fault of his. And, in driving livestock along the highway, the owner or possessor is liable only in the absence of reasonable care. *Erdman v. Gottshall,* 9 Pa. Superior Ct. 295.

Our Court has refused to follow *Rylands v. Fletcher,* L. R. 1 Exch. 265, L. R. 3 H. L. 330, which imposed absolute liability on a landowner for the escape of nondangerous substances from his land to the land of another. See *Pennsylvania Coal Co. v. Sanderson,* 113 Pa. 126. We there said, at page 150: "A rule which casts upon an innocent person the responsibility of an insurer is a hard one at best, and will not be generally applied unless required by some public policy, or the contract of the parties."

We have held that in blasting, a person conducting the operation is liable regardless of negligence, but this liability arises out of the inherently dangerous character of such explosions,[4] and requires one who inten-

---

[4] *Mulchanock v. Whitehall Cement Mfg. Co.,* 253 Pa. 262; *Baier et ux. v. Glen Alden Coal Co.,* 131 Pa. Superior Ct. 309, affirmed 332 Pa. 561; *Rafferty v. Davis,* 260 Pa. 563; *McGowan v. Steele & Sons Co.,* 112 Pa. Superior Ct. 552.

tionally causes the explosion to be affected with knowledge that injury may result beyond his power to prevent. He therefore must assume the risk. This is not strictly a case of absolute liability.

In cases of trespass for nuisance, the person responsible may be unable, no matter how careful, to avoid injury to the lands of another, but, again, he knows that injury may result from the nature of his activities regardless of care. Under such circumstances he also assumes the risk.[5] The responsibility for injury lies in creating or maintaining the harmful condition.

In all of these illustrations, the person responsible has, or should have, prior knowledge of the probable consequences, where the act done, or the instrumentality employed possesses potentialities of serious harm. From these cases it is apparent that our doctrine of liability without fault has very narrow restrictions even in its appropriate sphere of application.

When considering the field of personal injuries there appears no valid exception to the rule that liability can be based only upon intentional wrong-doing or lack of care. There are some cases which have been called, in other jurisdictions,[6] exceptions to this rule. In this State the possessor of wild or domestic animals of a known vicious or dangerous tendency is chargeable with knowledge of the vicious nature of the animal.[7] There is an element of wrongful conduct or a voluntary assumption of the known risk of injury to others in the mere fact of possession. As stated in *Andrews v. Smith et ux.*, 324 Pa. 455, at 457: " 'The negligence is in keeping such an animal after notice.' " As to animals nor-

---

[5] See *Stokes v. Penna. R. R. Co.*, 214 Pa. 415, 419; *Cavigan v. Refining Co.*, 186 Pa. 604, 612; *Hauck v. Pipe Line Co., Ltd.*, 153 Pa. 366, 374; *Ladner et al. v. Siegel et al.*, 296 Pa. 579, 585.

[6] See *Exner et ux. v. Sherman Power Const. Co.*, 54 Fed. (2d) 510, 514.

[7] *Andrews v. Smith et ux.*, 324 Pa. 455; *Sylvester v. Maag*, 155 Pa. 225; *Fink v. Miller*, 330 Pa. 193.

mally not dangerous, there is no liability unless the owner is negligent in his care of them. One who drives cattle through the streets of a city is not liable for injuries to third persons unless he fails to exercise care. *Potter T. & T. Co. v. Oswald & Hess Co.*, 322 Pa. 81. A person permitting a horse to stand unattended and untethered in the street is presumptively negligent, and liability for personal injuries may be predicated thereupon. *Goodman v. Gay*, 15 Pa. 188; *Henry v. Klopfer*, 147 Pa. 178; *Jordan et ux. v. Eisele*, 273 Pa. 95.

It has been stated that those engaged in an ultrahazardous activity are liable without fault for injuries caused by carrying on the activity. The rule has been applied in this State only to blasting, and the first cases involved injuries to land. Later it was extended inferentially to personal injuries.[8] In *Rafferty v. Davis*, 260 Pa. 563, at 568, it is stated: " 'in such a case the work itself is so inherently dangerous, that the doing of it, no matter how carefully, is of itself negligence, so that no amount of care in doing the negligent act will excuse the actor from the responsibility of the consequences which grow from it.' "

The storage of dangerous instrumentalities, such as dynamite, on the owner's land does not make him liable for injuries to persons or property if it explodes, unless it was negligently stored. The storage itself, even in the proximity of dwellings, has been held not to be a nuisance per se. *Sowers v. McManus*, 214 Pa. 244; *Derry Coal & Coke Co. v. Kerbaugh*, 222 Pa. 448. The handling of such substances merely imposes a high standard of care commensurate with the dangerous nature of the agency to personal safety. The general rule to be deduced from all of the cases involving the use

---

[8] See *McGowan v. Steele & Sons Co.*, 112 Pa. Superior Ct. 552. In *Baker v. Hagey et al.*, 177 Pa. 128, the court reversed the court below for charging the jury that recovery could be had regardless of negligence.

of dangerous substances and instrumentalities[9] has been summarized in *Fredericks v. Atlantic Refining Co.*, 282 Pa. 8, at page 13: "A higher degree of care is required in dealing with a dangerous agency than in the ordinary affairs of life or business, which involve little or no risk."

Another asserted instance of liability without fault for personal injuries is Workmen's Compensation. This liability is really contractual; if the employer does not contract he assumes a common law liability stripped of certain defenses. We held in *Rich Hill Coal Co. et al. v. Bashore*, 334 Pa. 449, in passing on the constitutionality of the Workmen's Compensation Acts of 1937 and 1938: "But in common law actions of tort, it is the 'law of the land' that liability cannot be imposed upon one who is without fault. To *legislate* a person presumptively guilty of either a crime or a tort is an attempted erosion of 'the substance of original justice.'"

In *Faiola v. Calderone*, 275 Pa. 303, we merely held that the employment of a child, in violation of a positive statutory duty, constituted negligence per se. In all such statutory regulations the legislature has adopted a public policy for the prevention of injury, and if the employer does not obey these preventive directions his act of disobedience is his negligence. We have not held liability without fault in automobile cases, and in the statutes covering the operation of airplanes the legislature has rejected the absolute liability theory.

To summarize, therefore, the cases mentioned, it may be stated that the doctrine of liability without fault has little or no place in torts involving injuries to the person, and its extension from the law of trespass to

---

[9] See *Konchar v. Cebular*, 333 Pa. 499; and *Fredericks v. Atlantic Refining Co.*, 282 Pa. 8 (as to gasoline); *MacDougall v. Penna. Power & Light Co.*, 311 Pa. 387, and also *Fitzgerald v. Edison Elec. Co.*, 200 Pa. 540 (as to electricity). *Hartman v. Citizens Natural Gas Co.*, 210 Pa. 19 (as to natural gas); *Lindh v. Protective M. Service Co., Inc.*, 310 Pa. 1 (as to firearms).

land has rarely been looked upon favorably in this State. In all of the exceptional cases there is a common ground of either antecedent negligence, or the assumption of a known risk of harm to others by intentional conduct. There is no element of injustice in imposing liability under such circumstances. Against the few exceptional situations in which absolute liability may have been applied, stands the great weight of modern authority that no man should be held liable for an unintentional injury resulting from the performance of a lawful act without negligence or wilful misconduct.[10] Pennsylvania has expressly approved this trend of the law as expressed by Justice HOLMES. See *Ebbert et al. v. Phila. Electric Co.,* 330 Pa. 257, 269. It must be an unusual case, therefore, and one amenable to no other solution as a matter of public policy, that would require this Court to extend the exceptional doctrine of liability without fault into a new field of commercial enterprise involving no recognizable probability of danger.

Considering the rule of supposedly absolute liability imposed in some jurisdictions on the publisher of a newspaper for his defamatory publications,—and this is the rule here chiefly relied on,—a close examination of the Pennsylvania law will show that our rule is not one of absolute liability, but rather, of a very strict standard of care to ascertain the truth of the published matter. *Clark v. North American Co.,* 203 Pa. 346; *Shelly v. Dampman,* 1 Pa. Superior Ct. 115.[11] The

---

[10] Justice HOLMES has said (The Common Law, p. 108): "the law does, in general, determine liability by blameworthiness." And, as stated by Professor Ames: (Law & Morals, 22 Harv. L. Rev. 97, 99): "The ethical standard of reasonable conduct has replaced the unmoral standard of acting at one's peril." (And see Winfield, The Myth of Absolute Liability, 42 L. Q. Rev. 37.)

[11] In the Clark case it was said, at p. 351: "Even in reporting an occurrence proper for publication there may be such an absence of the required diligence and care to ascertain the truth as to make the report libelous. . . . The mode of presenting the case to the jury made it turn on the intent, and ignored entirely the

fact of defamatory publication is evidentiary of such lack of due care. The rule that a newspaper publisher is absolutely liable for defamation originated in the English case of *Thorley v. Lord Kerry*, 4 Taunt. 355 (1812), and was apparently adopted by the United States Supreme Court in *Peck v. Tribune Co.*, 214 U. S. 185.[12] It may have been inspired by the frequency of defamatory newspaper publications or, as stated by one author, by their tendency to publish sensational and scandalous matter. It might be justified by the difficulty in proving negligence, since the facts of publication are exclusively known to the publisher and his agents.

The newspaper analogy of absolute liability has been approved in four cases as applied to radio broadcasting.[13] This analogy to newspaper liability, either un-

---

liability arising from negligent disregard of the injury that might be inflicted upon the plaintiff." At page 351, it was said: ". . . the jury should consider the whole article and determine from all the evidence, whether, notwithstanding the difference of name, the description was such either intentionally or by want of due care and diligence in ascertaining the true facts, that there would be a natural and reasonable inference that the plaintiff was the person referred to." In the Shelly case, the court said at page 123: "Conceding the occasion to have supplied the basis of privilege, the measure of diligence and care here shown to ascertain the truth of the statement published, is, in our opinion, entirely insufficient. It is not suggested in the point that there was any necessity or reason for such haste in publishing the defamatory matter as precluded inquiry, in the usual way, which would have revealed the utter falsity of the charge."

[12] In these and the following cases it was held that a newspaper publisher is liable for an unintentional defamation and cannot plead that he could not reasonably have known its libelous nature. See *E. Hulton & Co. v. Jones*, L. R. (1910) 35 App. Cas. 20, (1909) 2 K. B. 444 (Engl.); *Morrison v. Ritchie & Co.*, (1902) 39 Scottish L. Rep. 432; *Oklahoma Pub. Co. v. Givens*, 67 Fed. (2d) 62; *Taylor v. Hearst*, 107 Calif. 262, 42 Pac. 392; *Walker v. Bee-News Pub. Co.*, 122 Neb. 511, 240 N. W. 579.

[13] It will be noted the facts in all cases differ materially from those in the instant case. In *Sorensen v. Wood*, 123 Neb. 348,

der the Pennsylvania rule as stated, or under the broader rule existing in some other states, would support liability in the cases referred to, on their facts. Nevertheless, the analogy itself has been properly subjected to criticism by almost every legal commentator.[14] The

243 N. W. 82, the defamatory remarks were made by a political speaker to whom it had extended its facilities. The speaker used a prepared script that had not been previously submitted to the broadcasting company, though it could have obtained the script had it so desired. No effort was made to stop the transmission although the length of the remarks would have enabled the company to have done so. The principal defense was privilege under the Federal Statute which prohibits the censoring of political addresses. The case was submitted on the issue of negligence resulting in a verdict for the defendant. This was reversed, the court holding the defendant liable by analogy to a newspaper publication. This was not a case of "ad libbing" nor of "leasing." In *Miles v. Louise Wasmer, Inc.*, 172 Wash. 466, 20 P. (2d) 847, the speaker was an announcer employed by the radio station. The defamatory words derogatory to plaintiff were from a prepared script which the company could have edited itself. Under the authority of the Sorensen case, liability was upheld. In *Coffey v. Midland Broadcasting Co.*, 8 F. Supp. 889, the transmitting company was in New York and one of its chain members in Kansas City was sued for defamatory remarks made in New York and transmitted to its station by telephone. Time and facilities were leased to a commercial advertiser and the speaker was an employee of the advertiser. The defamatory remarks apparently were part of a prepared and rehearsed program appearing in the script submitted to and passed on by the broadcasting company in New York. The court in remanding the case recognized that the Sorensen and Miles cases could have been decided on the basis of negligence but held that in this particular case the facts were broader. Another case, *Irwin v. Ashurst*, 158 Ore. 61, 74 P. (2d) 1127, held that defamation in the broadcast of proceedings at a trial was privileged, but only if the report was true and accurate.

[14] See Bohlen, Fifty Years of Torts, (1937) 50 Harv. L. Rev. 725, 729-731; Haley, Law on Radio Programs, 5 George Washington L. Rev. 157, at p. 187; Keller, Federal Control of Defamation by Radio, 12 Notre Dame Lawyer 15, pages 153-162; Guider, Liability for Defamation in Political Broadcasts, 2 Journal Radio L. 708, at p. 713; Nash, Application of the Law of Libel and

American Law Institute in its Restatement of the Law of Torts refused to adopt it. In Section 577[15] the general rule is stated: "Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." To this is appended, in Comment (g), the following caveat: "The Institute expresses no opinion as to whether the proprietors of a radio broadcasting station are relieved from liability for a defamatory broadcast by a person not in their employ if they could not have prevented the publication by the exercise of reasonable care, or whether, as an original publisher, they are liable irrespective of the precautions taken to prevent the defamatory publication." This caveat was adopted after full discussion, on the ground that the decided radio cases were insufficient in number to require the acceptance of an analogy presenting such serious practical and legal difficulties.[16]

Moreover, the facts of this case must be kept in mind, as they differ greatly from the facts in the cases noted. The speaker here was an employee of a third party to whom the broadcasting company had leased its facilities. He was not under the broadcasting company's control, authority or command. The script used was examined and rehearsed exactly as written. It contained nothing offensive, and appellant, in renting its

Slander to Radio Broadcasting, 17 Ore. L. Rev. 307, at p. 309; Thornton, Liability of Radio Re-Broadcaster, 14 Ore. L. Rev. 492; Sprague, Freedom of the Air, 8 Air. L. Rev. 30; Frank, Defamation by Radio, 8 So. Calif. L. Rev. 359; Farnum, Radio Defamation and the A. L. I., 16 B. U. L. Rev. 1; Huston, Liability of Broadcasting Company, 12 Ore. L. Rev. 149; Socolow, Law of Radio Broadcasting (1939), Volume 2, page 858; Davis, Law of Radio Communication (1927) pages 163-164; Report of Standing Committee on Communications, 57 A. B. A. Rep. (1932) 423, 445-446.

[15] Restatement of the Law of Torts, Vol. 3, page 192.

[16] 12 Proceedings, American Law Institute, pp. 355 et seq.; 14 Proceedings, American Law Institute, 73 et seq.

facilities, had no reason to believe anyone would utter a defamatory statement. There was no power or means possessed by the broadcasting company that enabled it to prevent the transmission of the defamatory remark. It was physically impossible for the monitor or program director to have intervened, as the performer, without notice, interjected his terse defamatory remark so quickly that no one in appellant's employ was able to prevent its transmission.

In these circumstances the analogy between the radio broadcaster and the newspaper publisher is demonstrably weak, considering not only the practical differences between the two media of communication but the different conditions under which the industries operate. Newspaper matter is prepared in advance, reviewed by members of the various staffs, set into type, printed, proof read and then "run off" by employees of the publisher; at all times opportunity is afforded the owner to prevent the publication of the defamatory statement up to the time of the delivery of the paper to the news vender. The defamation thus may be said to be an intentional publication, or at least one published without due care.

Similarly, the broadcaster may, as it did here, require the submission of the script in advance for editing; it may require rehearsals and its production director may prevent the transmission of doubtful matter. But where the circumstances, like those now presented, are such that the defamation occurs beyond the control of the broadcaster, it is perfectly clear that the analogy between newspapers and broadcasting companies collapses completely. The superior control of the newspaper publisher is self-evident.

Other analogies have been suggested which, when first mentioned, may be thought of assistance, but when analyzed possess inherent weaknesses. In communications by telegraph the rule of due care has been invoked. We know of no case where a telephone company

has been held for defamation for the use of its lines, but its duty should rise no higher than that of a telegraph company. Both activities are public utilities, and cannot select the users of their facilities.[17] Radio companies are not in that category. They may select their performers and choose between applicants for the use of their facilities,[18] which are designed, not for private communications from one individual to another, but for those to the public generally.

It has been suggested that the dissemination of matter by radio may be likened to dissemination by news vendors and booksellers, who merely republish original utterances. The rule of absolute liability does not apply to such vendors.[19] While this is possibly a close analogy, and has the support of eminent legal writers, its weakness is in the fact that the sound which is transmitted to radio listeners is carried directly by the facilities of the broadcaster, though the activating impulse may have been the spoken word at the microphone. It is a trifle more than the mere delivery of a newspaper to the purchaser. It has been held that it is the reproduction of the spoken word from the broadcasting room: *Buck v. Jewell-LaSalle Realty Co.*, 283 U. S. 191, 199-201. The combination of the voice and the transmitting apparatus is necessary to effect the broadcast. The speaking and publication of a defamation are simultaneous.

The closest analogy suggested[20] is the loud-speaking device installed in public halls, owned, maintained and

---

[17] See Nash, Application of the Law of Libel and Slander to Radio Broadcasting, 17 Ore. L. Rev. 307, at page 312.

[18] *Sta-Shine Products Co., Inc. v. Station WGBB,* 188 I. C. C. Rep. 271.

[19] See Bohlen, Fifty Years of Torts, 50 Harv. L. Rev. 725, 731; Nash, Application of the Law of Libel and Slander to Radio Broadcasting, 17 Ore. L. Rev. 307, at page 311; Restatement of Torts, Vol. III, Sec. 581, comment (f).

[20] Bohlen, Fifty Years of Torts, 50 Harv. L. Rev. 725, 731.

operated, very much like the radio, by the owner of the premises. The halls are rented for public addresses, and may be equipped with outside amplifiers or loud-speakers, increasing the size of the audience. The only practical difference here is in the number of persons who hear the remarks. If the newspaper analogy is to be carried to its logical conclusion, the owners of the loud-speaking devices should be liable for the defamatory utterances of those leasing or using these devices.

The real difficulty arises from attempting to adapt to the new tort of radio defamation, rules of liability applicable in other fields of kindred, but not identical, types of wrong. Defamation in the law, until the radio appeared, was either libel or slander. Now, it is urged by some that the law of libel should be extended to defamation by radio because of the number of persons that hear it,[21] others indicate that it should be treated as slander.[22]

That part of the Roman law of defamation taken into the English law of libel was applicable to more serious cases. The strict rules of libel were originally directed at the printing press, which provided a wider means of publication. The differences between libel and slander, and the comparative ease of recovery in libel as against the more restricted and less stringent liability in slander, are well known. Some authors dispute these formal distinctions, asserting there is no

---

[21] See *Sorensen v. Wood,* 123 Neb. 348, 243 N. W. 82.

[22] See *Meldrum v. Australian Broadcasting Co.,* (1932) Victoria L. R. 425 (Australia). In *Locke v. Gibbons,* 164 Misc. 877, 299 N. Y. S. 188, it was held that the defamation was slanderous if made extemporaneously by the speaker. See Davis, Law of Radio, (1927), pp. 158-159. In *Miles v. Louis Wasmer, Inc.,* 172 Wash. 466, 20 P. (2d) 847; *Singler v. Journal Company,* 218 Wis. 263, 260 N. W. 431, and *Locke v. Benton & Boles,* 253 App. Div. 367, 2 N. Y. S. (2d) 150, the courts recognized the difficulty of classifying radio defamation as either libel or slander, but held that it was immaterial.

sound reason to support them.[23]   Among the factors
to be considered in reaching a rule of liability for def-
amation is the extent of the publication; but that is
not the only, or the main reason for the distinction be-
tween libel and slander. The more serious considera-
tion is the permanence of the printed libel, and its
capacity for continuous future harm over a wide area.
Slander, or the spoken word, is not bound to any set
form; it is easily fabricated and made to appear much
worse than actually spoken; it offers opportunity for
fraudulent and fictitious claims; it is usually uttered
in the presence of a few.   The law has, therefore, en-
cased it in most rigid rules.

When the radio sound reaches the human ear it is
the spoken word.   It is urged that the radio gives to
it a power for harm even greater than the printing press
gives to the printed word, but this conclusion does not
consider the factor of permanency just mentioned, nor
the traditional belief in the veracity of the printed word,
particularly important in the community where the in-
jured person resides.   Newspaper defamations possess
possibilities for real harm far greater than defamations
by radio, as they constitute permanent, continuing rec-
ords, which, through circulation, are constantly repub-
lished.   The radio word is quickly spoken and, generally,
as quickly forgotten.   Because of the differences in
power of the stations from which it is sent, it may re-
ceive widely varying circulation.

The radio is, admittedly, a powerful agency for ad-
vertising and the conveyance of important public mat-
ters, as well as the promotion of religion and politics.
It also affords its listeners a measure of entertainment,
and brings to them the reports of many occurrences
more quickly than the newspaper could possibly do.

---

[23] Veeder, The History and Theory of the Law of Defamation,
(1903) 3 Col. L. R. 546, 571; 3 Selected Essays of Anglo-Ameri-
can Legal History, 446; Restatement of Torts, Sec. 568, Historical
Note; 2 Socolow, Law of Radio Broadcasting (1939) 851-852.

It does, to a certain extent, compete with the newspaper. But these factors, standing alone, should not be sufficient to cast upon the radio the cloak of liability without fault for defamatory publications, as libels, by extension of the law applicable in some States to newspapers. The Restatement has taken the position that when the words broadcast are read from script it is libel, but has expressed no specific conclusion as to extemporaneous remarks.[24] As suggested in *Irwin v. Ashurst,* 158 Ore. 61, 65, 74 P. (2d) 1127, 1129, the distinctions of libel and slander seem inapplicable to the law of radio. We did not pass on the question in *Weglein v. Golder,* 317 Pa. 437.

Radio broadcasting presents a new problem, so new that it may be said to be still in a state of development and experimentation. It was not conceived nor dreamed of when the law of libel and slander was being formulated. Publication by radio has physical aspects entirely different from those attending the publication of a libel or a slander as the law understands them. The danger of attempting to apply the fixed principles of law governing either libel or slander to this new medium of communication is obvious. But the law is not so firmly and rigidly cast that it is incapable of meeting a new wrong as the demands of progress and change require. In this State our tort actions are in trespass; the pleader need not lay his cause either in slander or in libel, and, as defamation by radio possesses many attributes of both libel and slander, but differs from each, it might be regarded as a distinct form of action. Certainly, there is no necessity of extending to this situation a so-called rule of absolute liability without fault, particularly when our law of libel merely creates a high standard of care. A rule should be applied which will not impose too heavy a burden on the industry,

---

[24] Restatement of Torts, Vol. III, sec. 568, comments (d) and (f).

and yet will secure a high measure of protection to the public or those who may be injured.

That a rule of this nature should be adopted becomes increasingly apparent when it is considered that in the field of its operation radio broadcasting is subjected to many restrictions which are not imposed upon newspapers. Any person, firm, or corporation may publish a newspaper without asking the government's consent. Newspapers are the freest medium of communication in this country today. They are protected by the Constitution, by statutes, and by the liberal decisions of many courts. They determine their own policies, print as they desire, unrestricted and unlimited, except by criminal statutes for libel and by the possibility of civil action. The rule of civil liability for libel applicable to them is just and fair, considering the opportunities of correction or control.

On the other hand, a broadcasting company cannot operate without a license from the Federal Government, which must be renewed from time to time. No license may be granted unless the licensee serves the public interest. Radio is a governmentally-regulated industry. The number of stations, their locations and wave-lengths, the hours in which they may broadcast, and their transmitting power, are all subject to regulation. In this manner their effective range of communication and the number of their listeners may be controlled. The power of Congress in this respect, has been upheld as essential. *Radio Comm'n v. Nelson Bros. Co.*, 289 U. S. 266. Under the Act of June 19, 1934, c. 652, Section 303, 48 Stat. at L. 1082, as amended May 20, 1937, c. 229, Sections 5, 6(a), 50 Stat. at L. 190, 191, 47 U. S. C. A. Section 303, the Federal Radio Communications Commission is given broad powers to formulate rules for the conduct of radio stations; severe penalties are imposed for violations. *A broadcasting company that oversteps these rules may have its license revoked and lose the value of its entire plant;* this, in the realm of radio, is capital

punishment. And, the publication by a broadcasting station of defamatory matter, as also the transmission of certain forms of false and fraudulent advertising, may, if persisted in, result in the revocation of the license of the station or its deletion. But, even here: "It seems inherently unreasonable to suppose that a station should be deleted by the Commission for the dissemination of defamation without knowledge or fault of the licensee."[25]

Again, if the broadcaster is to be adjudged liable without fault for a defamatory remark and if the defamation is to be regarded as a libel, he might also become guilty of criminal libel, though, as in the circumstances before us, he is as innocent of wrong as one could possibly be.

All of these considerations cause the newspaper analogy to utterly fail, and no consideration of public policy could in any sense cause a broadcaster to be punished by a rule of absolute liability such as that invoked by the court below. If, as has been suggested, the imposition of such liability on newspapers was originally desirable as a matter of public policy because of the frequency of defamatory publications, and because no other means of discouraging the practice was available, these reasons do not exist in the case of radio broadcasting. Radio defamations have been infrequent, and governmental regulation affords a potent check.

It has been stated that the public "will be best served by a rule which will release a broadcasting station from liability for defamatory remarks made by others, whereever it appears that the management of the station exercised due and reasonable care to avoid the utterance of the defamation."[26] To inflict the rule of absolute liability would serve no useful purpose. It would not

[25] Haley, Law of Radio Programs, 5 George Wash. L. Rev. 157, at pages 188-189.

[26] Guider, Liability for Defamation in Political Broadcasts, 2 Journal Radio Law, 708, at 712-713.

only place an unreasonably heavy burden upon the industry, but would open the door to frauds and perjuries as gross as could be practiced in actions of slander, and which could never be practiced successfully against a newspaper publication for libel. In situations like the present case, for instance, the broadcasting company might just as easily be the victim of a conspiracy to defame, participated in by the hotel and the speaker. Such conspiracies to defame might wreck the strongest broadcasting company and might become a widespread evil. Here lies the strength of the newspaper, for its printed word cannot be distorted or fabricated.

It is urged that appellant should have taken some steps to correct the remark before the program closed; that, not having done so it in effect adopted the remark. From the evidence the directors of both appellant and lessee endeavored to have the statement corrected and were partially successful. However, if appellant was liable when the remark was made, the explanation would have been merely in mitigation of damages. The converse is true. Not being liable nor responsible for the utterance when made, the lack of a full explanation or apology would not make appellant liable. Here again the facts must be considered. Any explanation or apology would not only tend to emphasize the defamation, but there would arise the question of its adequacy; the fact that it was omitted would not, of itself, impose liability, under the circumstances before us, against the lessor whose facilities were leased to a responsible agency for the broadcast of a nondefamatory commercial program, without the slightest intimation that they would be abused.

It is suggested that absolute liability should be imposed because appellant could protect itself therefrom by an indemnifying bond. This is the weakest of all arguments, and begs the question. It is indeed a new theory that a substantive rule of law should be based upon the possibilities of an indemnifying bond to save

an innocent person from loss. If an indemnifying bond is to be the basis of judgment, then in all actions for personal injury it would be well to establish a general rule of absolute liability, requiring the party to be held liable without fault to take out a bond. It is inconceivable that any bonding company would place at a reasonable figure a bond to indemnify a broadcaster against absolute liability, and against the revocation of its license by the Federal authorities, as a result of an act which it did not perform, inspire, nor control.

In considering the basis of liability for defamation by radio and in balancing the conflicting interests, due regard must be had to the rights of all parties, and to the ultimate and collateral effects any pronouncement might have on public interests. A rule unalterably imposing liability without fault on the broadcasting company under any circumstances is manifestly unjust, unfair and contrary to every principle of morals. A fair aspect of the harm to the persons injured must be considered as well as the circumstances under which the incident occurred. An essential consideration in formulating a rule is the grave possibility of pyramiding damages as well as establishing criminal responsibility if defamatory broadcasting is treated as libel.

We therefore conclude that a broadcasting company that leases its time and facilities to another, whose agents carry on the program, is not liable for an interjected defamatory remark where it appears that it exercised due care in the selection of the lessee, and, having inspected and edited the script, had no reason to believe an extemporaneous defamatory remark would be made. Where the broadcasting station's employee or agent makes the defamatory remark, it is liable, unless the remarks are privileged and there is no malice.

We have assumed in our entire discussion that the remarks here made were actionable per se,[27] and that

---

[27] Appellant disputes this strenuously, and with much merit.

if the station were liable therefor it would not be necessary to prove malice or special damages. Regardless of these considerations, since it is conceded that there was no possible way in which appellant could have anticipated or prevented the remark, appellee has no cause of action against the broadcasting company.

Judgment reversed and here entered for appellant.