STATE OF NORTH DAKOTA, Respondent, v. GRACE E. PHILLIPS, Appellant.

(213 N. W. 355.)

**Witnesses — cross-examination in criminal case.**

In a prosecution for assault with a dangerous weapon, where the jury returned a verdict finding the defendant guilty of assault and battery, it is *held*, for reasons stated in the opinion, that it was prejudicial error to permit

Annotation.—On right to cross-examine witness in criminal case, see 28 R. C. L. 609.

an important witness for the defendant to be cross-examined in such a man-
ner as to charge by innuendo that he had rendered improper services in con-
nection with other trials and that he was in attendance upon this trial
for the purpose of rendering similar improper services by way of influencing
witnesses and jurors.

Opinion filed April 4, 1927.

Criminal Law, 17 C. J. § 3657 p. 313 n. 45; § 3659 p. 316 n. 5.   Witnesses, 40
Cyc. p. 2627 n. 83.

Appeal from the District Court of Foster County, *Coffey*, J.

Reversed and new trial granted.

*Dudley L. Nash,* for appellant.

"While acts of indiscreet severity are not criminally punishable, un-
less under the conditions set out, their check for the good and wel-
fare of society must be found in the promptings of parental affection
and a wholesome public opinion, and if these are insufficient they must
be tolerated as an incident to the relation which human laws cannot
wholly remove or redress."   State v. Pendergrass, 31 Am. Dec. 416.

"Family government is recognized by law as being as complete in it-
self as the state government is in itself, and yet subordinate to it."   State
v. Rhodes, 61 N. C. (Phill. L.) 453, 98 Am. Dec. 78.

A motion for a new trial on the ground that the verdict is contrary
to the evidence is an appeal from the jury to the court on a question
of law, and hence to set aside a verdict unsupported by evidence is not
an invasion of the province of the jury.   16 C. J. 1178, § 2707.

"Where there is doubt as to the duty to grant a new trial it should
be resolved in favor of defendant."   16 C. J. 1120, § 2620.

*J. J. Youngblood,* State's Attorney, and *W. E. Matthaei* for respond-
ent.

BIRDZELL, Ch. J.   This case arises out of a tragedy that occurred in
the village of Harvey on August 4, 1924.   The tragedy came as the
climax of a reckless escapade of a young girl approximately seventeen
years of age, in which minor parts were played by two men and a Ford
coupe.   The story is one of a night of joy-riding culminating in the
young girl's stealthy approach to her home at a very late hour and

the finding of her prostrate body upon the sidewalk between the street and the front door about 5:30 or 6 o'clock in the morning.

Owing to the view we take of the case it will not be necessary to discuss in this opinion the sufficiency of the evidence, and hence there is no occasion to set forth in elaborate detail the story which the record reveals. Suffice it to say that some thirteen years prior to the tragedy in question the defendant and her husband, lacking children of their own, secured the co-operation of the State Humane officer, in a worthy effort to give a home to some children who might otherwise be public charges and be compelled to grow up without knowing the blessings of parental love and guidance. As a result the young girl in question, later called Dolly Phillips, and a younger brother, Ted, then small children, were brought to the Phillips home in Harvey, where Dolly remained until sometime after the event which gave rise to this prosecution, except during such times as she was attending school elsewhere. The family relations of the Phillips were disrupted by a separation and divorce, but Dolly continued to live with the defendant. She was never adopted as a daughter, but there is much in the record to evidence the existence between the defendant and Dolly of an affectionate regard for one another like unto that existing between a parent and child. At times when Dolly was attending school elsewhere or when she and the defendant were separated, her letters teemed with those buoyant expressions of endearment which are characteristic of youth. But Dolly on the witness stand disavows the existence of the affection which is written in her letters and which is subtly betrayed in the narrative of incidents occurring in the family life. As a witness she portrayed the one whom she had been accustomed to calling mother as a person of violent temper, more or less prone to resort to extreme disciplinary measures, and one from whose wrath she was wont to seek at various times the protection of her foster father.

When she was picked up from the sidewalk on the morning in question and carried into the house in a dazed condition, and afterwards while in the presence of persons other than the defendant, she did not, so far as this record discloses, give utterance to any expression that would charge her mother with the assault which had evidently been committed by somebody. But the finger of suspicion in the community seemed to point to the mother. Sometime after Dolly had recovered

she left home and went to Valley City where some relatives resided. After she had been away from home for a period, she charged the defendant with the guilt. This prosecution followed. The case was transferred to the adjoining county of Foster and tried, resulting in a verdict of guilty of assault and battery, upon which the defendant was sentenced to thirty days in jail and to pay a fine of one hundred dollars. From that judgment this appeal is taken.

Upon the trial the relations between the defendant and the complaining witness were the subject of a minute and extensive examination. The apparent purpose of this was to disclose on the one side a lack of such a degree of affection as would restrain a parent from resorting to the violence which had been manifested toward this wayward girl on the night in question. To combat this evidence the defendant produced not only a large number of letters written by Dolly when the two were separated temporarily, but she placed on the witness stand those who were apparently most familiar with their family life. From this evidence we get diametrically opposite views of the defendant: one in which she is depicted as the "irksome brawling scold" with a domineering disposition and a wilful determination that brooks no opposition; the other in which she is presented as excelling in all the virtues that love inspires. We are not called upon to determine which picture the better portrays her personality. The record shows that before her husband came to the end of life's journey her spirit had been somewhat chastened by the blight of domestic infelicity, and who knows but what she could truthfully declare with Catharina?

"My mind hath been as big as one of yours,

My heart as great; my reason, haply, more,

To bandy word for word and frown for frown;

But now I see our lances are but straws;

Our strength as weak, our weakness past compare,—

That seeming to be most which we indeed least are."

The leading witness for the defendant was W. E. Cook. He testified to having been the first resident of Harvey; that he had been acquainted with the Phillipses for from twenty to twenty-five years; that he had been frequently in their home; that he remembered when the Phillipses took Dolly and Ted to raise; that he had given substantial

presents to the children; and he enumerated instances of the manifestations of affection by the mother toward the children.

Upon this appeal error is predicated upon the following cross-examination of this witness:

"Q. Now Mr. Cook, you say you have been in Wells County and at the city of Harvey, for thirty-three years, about?

"A. It will be thirty-three years next month, as I—

"Q. And you have been a close friend to the Phillips for a portion of that time? A. Yes, sir.

"Q. And you have been a very close friend to me during most of that time, haven't you? A. I think so. I know we tried the first lawsuit together thirty-three years ago in Harvey, that was tried there.

"Q. And we have been connected with lawsuits and other affairs have we not? A. Sometimes.

"Q. You remember a little about that we were both connected with a murder trial up at Rugby, do you not? A. Yes, sir.

"Q. You were in that to a considerable extent, were you not?

"Mr. Bangs: That is objected to as incompetent, irrelevant and immaterial and improper cross-examination.

"The Court: I will allow the question.

"A. Yes. It was the trial—do you refer to the trial of Dupseck.

"Q. Exactly. You helped those ossified lawyers at that time, a little bit, didn't you?

"Mr. Bangs: That is objected to as incompetent, irrelevant and immaterial and not proper cross-examination; calling for an opinion and conclusion of the witness and injecting collateral issues into this case.

"The Court: Overruled.

"A. I always helped when I considered they needed it.

"Q. And you did in that case? A. Yes, sir.

"Mr. Bangs: We interpose the same objection.

"The Court: Overruled.

"Q. Tell if it is a fact or isn't a fact that you got a quarter section of land for your services in that case?

"A. It is—

"Mr. Bangs: That is objected to as incompetent, irrelevant and immaterial and not within the issues of this case; bringing in collateral issues.

55 N. Dak.—18.

"The Court: Sustained.

"The Witness: This insinuation, I would like to answer.

"Mr. Bangs: Withdraw the objection.

"A. It is an absolute lie and I will invoke the protection of the court that I have as a witness to answer any such insinuation or innuendo. I never got one cent and I never asked for a cent, and I want to say to you, Joe Youngblood, that you won't get up and swear that during the thirty years you have known me, that there is one transaction that wasn't on the square with you or any other man, and I would like further to say for my protection to this jury that I have done business in Wells county for thirty-three years and I have done as much as $450,-000 worth of business a year among the poor people, and I have carried over $150,000 a year, and have had mortgages on these people for everything from their dog to their souls, and I never foreclosed a mortgage in my life.

"Q. Now, Mr. Cook, I wasn't getting at you in that way. I understood the question, that at that time and in that matter in which you and I were associated together, that you simply got a quarter section of land and handled it to the benefit of the defendant? A. You lie, Joe Youngblood.

"Mr. Bangs: I think if the court please this controversy between Mr. Youngblood and the witness has gone far enough.

"The Court: I sustained your objection and you withdrew it.

"Mr. Bangs: I think this is an injustice to this witness.

"Mr. Youngblood: Now, Mr. Cook, if you understood that I meant that you surreptitiously pocketed anything yourself in that case, that is a misunderstanding.

"Mr. Bangs: It seems to me that the apology of Mr. Youngblood need not be put on the record. We don't need it in this case.

"Q. Now passing that up. You have been connected with me and with others in a great many cases up around Wells county, haven't you?

"Mr. Bangs: That is objected to as incompetent, irrelevant and immaterial and not proper cross-examination; not within the issues.

"The Court: Sustained.

"Q. You came down here in this case in what capacity?

"A. I came down here in the single capacity as a witness for the defense.

"Q. And you came down for that, with me, last Monday, didn't you, on the same train?

"A. I came down on the train in which you were riding. You got on at Fessenden.

"Q. Now as a matter of fact, you knew, Mr. Cook, and you still know, that it wasn't necessary for you to be here in attendance of court on Monday as a witness for the defendant, did you not?

"A. I wanted to hear this case. I was anxious to hear this case.

"And you came down here in connection, to be a witness in this case, also to be very affable in this court to the witnesses for the state and the defendant, and possibly also to the jurors in this case?

"Mr. Bangs: That is objected to as incompetent, irrelevant and immaterial and not proper cross-examination; insinuations that have no place here.

"The Court: Overruled.

"Q. I will answer that by saying to the jurors—

"Q. Jut answer the question. A. I haven't spoken to any of them known to be jurors except one Guy Walton, whose father used to be a personal friend of mine. I said 'Hello Guy—you are getting old.' I can repeat the conversation—three of them were down in the sheriff's office and I spoke to them in the presence of the sheriff, not bearing upon this case. As to being affable with the witnesses on the other side—we scrap on politics and religion.

"Q. Then it is of course true that you came down here with me on the train Monday and have been around this court ever since for the sole purpose of being a witness for the defendant and just incidentally absorbing the testimony of the state for your own benefit?

"Mr. Bangs: That is objected to as being a compound question; either one is objected to on the ground it is incompetent, irrelevant and immaterial, injecting collateral issues in the case and not proper cross-examination.

"Mr. Youngblood: I will withdraw that.

"Q. Then the only reason that you came down to Carrington on the train last Monday and have been here ever since, was to tell on the witness stand now how kindly you have been to the waifs and how good this defendant has been?

"Mr. Bangs: That is objected to as calling for a conclusion and opin-

ion of the witness; improper cross-examination and a compound question, and it is incompetent, irrelevant and immaterial.

"The Court: Overruled.

"A. In answer to that I will say that I came down primarily to discuss a question with Hoopes & Lanier, where they had begun suit against me in a small matter and also to attend this trial, but I had agreed to be down to see them, and the thing was put off a week longer, but I felt that I should come down at first, but I came down to this trial, and I am not offering that as an excuse and I have conducted myself in a proper manner towards the court and the law and I am surprised that you the state's attorney should try to take charge of a witness and take advantage of him and try to deviate from the facts and get something else.

"Q. Now, Mr. Cook, you have conducted yourself in this case just as honorable as you have in every case that you and I have been connected with, I admit that.

"Mr. Bangs: That is objected to as calling for a conclusion and opinion of the witness and not proper cross-examination.

"The Court. Sustained."

The above is the entire cross-examination of this witness. It is wholly foreign to the matter embraced in his direct examination. It will be noted that at the outset of the cross-examination the witness was made to appear as a friend of the cross-examiner of many years standing, and the incident of their attendance upon a murder trial in another county, years previously, was brought out over appropriate objection by the defendant. Additional questions were asked and answered, likewise over appropriate objection, in such a manner as to clearly indicate that the witness had served one side or the other in that litigation in an improper manner. Then he was asked if he had not received a quarter section of land for his services and it was not until this juncture was reached that objection was sustained. But upon intimation from the witness that he should like to answer the insinuation, the objection was withdrawn. Later the witness was asked whether or not he had come to attend this trial as a witness and also to be affable with the witnesses for the state and the defendant—possibly also with the jurors, and he was permitted to answer this over appropriate objections. By reason of the original improper question relating to the murder trial at Rugby, an issue of

veracity apparently had been drawn between the witness and the cross-examiner and the questions were asked in such a way as to charge by innuendo that the witness, having had some illicit connection with a murder trial some years before, was in attendance upon this trial in a somewhat similar capacity and was associating with witnesses and jurors for the purpose of achieving a given result:

Clearly, the law does impose upon either the witness or the defendant the burden of justifying generally the witness's conduct upon the occasion of another trial in which he and one of the attorneys were apparently interested. If it is desired to impeach a witness, the well defined avenues of impeachment should be followed. He can of course be asked concerning his guilt of some offense in the past, but the offense should be clearly stated, so that both the witness and the jurors may have a definite understanding of the matter relied upon for impeachment. It does not require argument to demonstrate that an innuendo of the character of that exhibited here—especially when connected with a similar general charge affecting the relations of the witness with the other witnesses and jurors at the instant trial—is calculated to introduce foreign considerations into the deliberations of the jury. Jurors are human and it must be assumed that the natural impulse to protect one's good name against a charge of corruption would be aroused, which could but result in an inducement to a verdict for the untainted party. In such a case as this where the only eye witness has testified contrary to her statements out of court and where the evidence is largely circumstantial, its effect, in our opinion, must be held to be prejudicial. We deem it proper to remark that counsel do not attempt to justify on legal grounds this cross-examination. Their justification is rather in the nature of an excuse predicated upon the exceedingly broad scope of the trial and particularly the cross-examination of the complaining witness. While there may be much to be said for this view were a criminal prosecution to be regarded as a contest to be decided according to the skill or wit displayed in arranging and presenting the dramatic elements in the human relationships involved in a given controversy, we are bound to place these matters to one side and to determine whether or not the contest has been conducted with proper regard for the principles governing the production and weighing of evidence.

The judgment appealed from must be reversed and a new trial granted. It is so ordered.

NUESSLE, BURKE and BURR, JJ., concur.

CHRISTIANSON, J.:

I agree with my associates that most of the cross-examination of the witness Cook set forth in the opinion prepared by the chief justice was improper, but I am not prepared to say that there was any resulting prejudice. The questions permitted by the trial court over defendant's objection were preliminary in character. Certainly, no one would seriously contend that any prejudicial ruling would have been made if the examination had stopped with the question to which objections were overruled by the trial court. The greater portion of the improper cross-examination was had with the permission of the defendant and at the insistence of the witness in question after the trial court had sustained an objection.

It is not conceivable to me that intelligent and honest jurors could have been so influenced by what was said during the cross-examination as to affect their verdict in the case. And I find nothing to indicate passion or prejudice on the part of the jury. The case was tried in a county other than that in which it is charged the offense was committed, a change of venue having been granted upon the application of the defendant. The instructions to the jury were eminently fair. The defendant was charged with assault with a dangerous weapon with intent to do great bodily harm. The jury acquitted her of the graver offense and found her guilty of the included offense of assault and battery. Except as to that portion of the principal opinion which holds the cross-examination of Cook to be prejudicial error, I agree with that opinion.