[File No. 6864.]

PAUL HAGGARD, Appellant, v. FIRST NATIONAL BANK OF MANDAN, a Corporation, E. O. Lidstrom, Sheriff in and for Morton County, North Dakota, and Philip Helbling, Deputy Sheriff of Morton County, North Dakota, Respondents.

(8 NW(2d) 5.)

436

Opinion filed February 9, 1943.

*Murray & Murray,* for appellant.

*Sullivans, Fleck & Higgins* and *Charles D. Cooley,* for respondents.

Morris, Ch. J. This is an action for damages. The complaint sets forth two causes of action; one for false arrest and the other for slander. The case was tried to a jury. A verdict was rendered in favor of the defendants. The plaintiff now appeals from the judgment dismissing the action on the merits and from an order denying a new trial.

On August 18, 1938, the plaintiff, Paul Haggard, who was then employed by the City Motor Company of Mandan, sought to make a loan from the First National Bank of Mandan on an automobile that he was purchasing from his employer. He was advised that the bank would not lend him the money on the car but if he purchased it on a conditional sales contract the bank would furnish the money and take an assignment of the contract.

On August 19, the plaintiff and one A. C. Rausch, manager of the City Motor Company, went to the bank and entered into a conditional sales contract covering the sale of the automobile in question from the City Motor Company to Paul Haggard for the sum of $250 upon which there was an unpaid balance of $125. The bank took an assignment

of the contract and paid $125 to Rausch in the presence of the plaintiff. The unpaid portion of the purchase price was payable in instalments, the first instalment being due September 3, 1938.

There is a dispute in the testimony as to what the plaintiff told the bank he wanted the money for. He said that part of it was to be used for a vacation. The officers of the bank testified that nothing was said about a vacation but that Haggard said he wanted the money for the purchase price and for repairs and accessories to the automobile.

The conditional sales contract was in the form generally used for the sale of automobiles and provided that the title to the property should not pass to the purchaser until the amount specified therein was fully paid. The assignment to the bank contained a guaranty of payment on the part of the City Motor Company.

On August 23, 1938, at about five o'clock A. M., the plaintiff left Mandan with the automobile in which he had as passengers his wife, three children, and two other persons. He intended going to the west coast. The purpose of the trip is in dispute. He testified he was going on a vacation. There is also testimony in the record to the effect that he was going to the west coast to look for employment. The day before he left, the house trailer in which he lived in Mandan was brought to Bismarck and left on the back of a lot belonging to his brother-in-law. He contends that because it contained his furniture and household belongings he brought it to Bismarck for safekeeping. The defendants contend that he had made arrangements to sell it.

During the forenoon of August 23, A. C. Rausch called the First National Bank and talked to A. R. Weinhandl, vice president and cashier of the defendant bank. He asked the cashier whether Haggard had been given permission to take the automobile out of the state. Upon being advised that permission had not been given, Rausch advised the cashier that Haggard had "pulled out for the west coast." Rausch also told the cashier that he had seen the trailer house being moved to Bismarck and had contacted Haggard's brother-in-law and that the brother-in-law had told him that Haggard had gone to the west coast to look for a job. Rausch further advised the cashier that Haggard had sold the trailer house to his brother-in-law in Bismarck. The cashier then wanted Rausch to come to Mandan and take care of

the matter but Rausch said, "I can't come over. I am tied up here for a couple of hours. . . . We will have to get immediate action because I understand he has had similar trouble. . . . You notify the sheriff and have him broadcast for him." The cashier then called the sheriff's office. A deputy sheriff came down to the bank and the cashier told him what Rausch had said. The deputy then left the bank saying that he was going to notify the broadcasting station. In about half an hour he called back and advised the cashier that it might be necessary to get a warrant. The cashier then told the deputy that if it was necessary he would have a warrant issued.

In the afternoon of August 23, the plaintiff's brother-in-law came to the bank and asked if there was any way that matters could be settled up so that Haggard could continue on his trip. The brother-in-law told the cashier that he had bought the trailer house and was negotiating for a loan of $100 to pay on it. The brother-in-law then left. Later the plaintiff's brother, Clarence Haggard, came to the bank and offered to give security on his own automobile. Later upon learning that the plaintiff wanted to come back to fix up the matter, Clarence withdrew his offer.

At the time of the incidents involved in this case the sheriff of Morton county was out of town. His office was represented by Deputy Sheriff Philip Helbling. The deputy corroborates the testimony of the cashier as to being called to the bank and the conversation concerning the plaintiff and his trip west. The deputy testified that from the information he received he honestly believed that Paul Haggard had committed a felony. Upon receiving the information from the cashier of the bank the deputy sheriff called the radio station at Bismarck and asked to have a special police bulletin put on the air giving the name of the plaintiff, the description of the automobile and asking that the driver and the car be held. The broadcast described the car as being a stolen car. The deputy, however, testified that he informed the radio station that it was not a stolen car but was mortgaged property subject to a lien and had been taken out of the state and county. The deputy falsely advised the radio station that he had a warrant for the arrest of Paul Haggard when in fact none had been issued. No warrant was ever issued.

After authorizing the broadcast the deputy called the sheriff's office at Glendive, Montana, and advised that the Chevrolet car and the driver, Paul Haggard, were wanted and that "we have a warrant for the arrest of this man." The sheriff at Glendive was also advised to listen to the broadcast that would be on the air shortly.

The sheriff at Glendive listened for and heard the broadcast. He or his deputy then intercepted Haggard as he drove into Glendive and arrested him. The arrest occurred shortly after noon. Haggard was held in custody until about five o'clock. In the meantime, several telephone conversations were had with the sheriff's office at Mandan. Haggard wanted to return voluntarily to Mandan and arrange a settlement of the matter. Such an arrangement was finally made and that evening Haggard took the train back. He left his family at a trailer camp in Glendive. The car was left there in a garage.

Haggard never reported to the sheriff in Mandan but on the morning of August 24 he and his brother Clarence went to the bank. Later in the day settlement with the bank was made by the payment of $131.60 which included principal, interest, abstract and filing fees. The plaintiff was then released and returned to Glendive for his car and family. He did not continue on his trip but came back to Bismarck.

From the foregoing facts it clearly appears that the plaintiff was arrested and held in custody for some time without a warrant. He claims to have been unlawfully and illegally arrested and falsely imprisoned.

The jury found for the defendants. As grounds for the reversal of the judgment of dismissal the plaintiff specifies insufficiency of the evidence and numerous errors at law based upon rulings of the trial court and instructions to the jury.

We will first consider the cause of action based on unlawful arrest and false imprisonment. Section 10,567, ND Comp. Laws 1913, provides that a peace officer may arrest without a warrant in the following instances:

"1. For a public offense, committed or attempted in his presence.

"2. When the person arrested has committed a felony, although not in his presence.

"3. When a felony has in fact been committed, and he has reasonable cause for believing the person arrested to have committed it.

"4. On a charge, made upon reasonable cause, of the commission of a felony by the party arrested."

In finding for the defendants the jury must have determined that Paul Haggard's arrest without a warrant was justified under some provision under § 10,567, supra. We, therefore, examine the facts and the law in order to determine whether such a finding on the part of the jury is warranted by the record in this case.

The court read § 10,567, ND Comp. Laws 1913 to the jury and further instructed them that: "the sheriff, or his deputy, had a legal right to arrest the plaintiff in this case, if the plaintiff had committed a felony, although not in the presence of the officer; or, if a felony had been in fact committed, and he, the sheriff, or his deputy had reasonable cause for believing the person arrested had committed the crime. And further the sheriff or his deputy would have a legal right and lawful authority to arrest or cause the arrest of the plaintiff on a charge, made upon reasonable cause, of the commission of a felony by the plaintiff."

The jury thus had before it the statute together with the above instruction of the trial court. The evidence in the record is sufficient to warrant the jury's verdict with reference to lawful arrest without a warrant upon either of two grounds enumerated in the statute.

The jury may have determined that a felony had in fact been committed by Paul Haggard although not in the officer's presence. Section 10,248, Supp. to ND Comp. Laws 1913 was also read to the jury by the trial court. This section provides that every person having in his possession or under his control personal property upon which there is known to him to be a conditional sales contract who unlawfully removes such property from the county without the consent of the holder of the contract is guilty of a felony if the property exceeds $100 in value.

Under the facts in this case there can be no question but that Haggard removed the automobile from Morton county without the written consent of the bank and that the automobile was worth more than $100. The plaintiff strenuously contends that he was merely going on a vacation and intended to return with the automobile; that he had no

intention to injure or in any way deprive the bank of its security; that his acts were therefore entirely lawful and that he committed no crime that could be the basis of his arrest without a warrant. In support of his argument he cites Rhoads v. First Nat. Bank, 37 ND 421, 163 NW 1046, wherein it is held that in order to constitute a crime under § 10,248, Comp. Laws, the acts complained of must have been done willfully and that there must be some circumstances other than the mere removal of the property to show bad purpose or evil intent.

The court instructed the jury as to the necessity of evil intent, part of the instruction being taken verbatim from Rhoads v. First Nat. Bank, supra.

The fact that the plaintiff was not prosecuted and convicted of a felony is not in itself conclusive as to his intention. The jury had before it many facts and much disputed evidence. They decided against the plaintiff. This indicates that the jury took the view of the evidence most favorable to the defendants. Under this view they were *justified in reaching a number of conclusions inconsistent with plaintiff's good intent.* He left Mandan at an early hour in the morning after having previously told his employer that he would be at work that day. He filled his car with gasoline and oil without paying for it. He sold his trailer house to his brother-in-law and moved it to Bismarck. He started for the west coast, not on a vacation but to look for a job. He left without telling either his employer or the bank. His family accompanied him.

Under the state of this record the jury was warranted in determining that he removed the automobile from Morton county and from the state of North Dakota without consent of the vendor, willfully and with evil intent, and that his arrest without a warrant was justified on the ground that he had thereby committed a felony.

The jury may also have determined that the plaintiff was lawfully arrested under paragraph 4 of § 10,567, quoted above. The wording of § 10,567 is identical with the first four paragraphs of § 836 of the Penal Code of California. Under paragraph 4 of both our statute and that of California a peace officer may arrest without a warrant "on a charge made, upon a reasonable cause, of the commission of a felony by the party arrested." The plaintiff contends that the word

"charge" means a formal written charge presented to a proper authority and that an oral charge or accusation made to a peace officer will not justify an arrest without a warrant. The statute is not so construed in California. Dowdell v. Owl Drug Co. 121 Cal App 316, 8 P (2d) 890, involved an action for damages for false imprisonment. The plaintiff was arrested upon an oral accusation or charge. In commenting upon the trial court's instructions to the jury the appellate court said: "If an officer has received information whereby upon a reasonable cause a charge is made of the commission of a felony by the party arrested, the law does not say that he must postpone the arrest for the purpose of investigating claims made by the accused person in support of his or her asserted innocence. It may be that in many instances this would be a reasonable and proper course for an officer to pursue; but in the interest of public safety, the law refrains from saying that an officer, before he can make a lawful arrest, must not only have received information sufficient to constitute probable cause for the charge, but that he must further pursue the inquiry at the request or dictation of the person about to be arrested." See also People v. Brite, 9 Cal (2d) 666, 72 P 2d 122; Cook v. Singer Sewing Mach. Co. 138 Cal App 418, 32 P (2d) 430.

Facts heretofore outlined were presented to the deputy sheriff of Morton county. Many of these facts were disputed. Whether they are sufficient to constitute a charge made upon a reasonable cause of the commission of a felony by Paul Haggard was a question for the jury. The jury having rendered its verdict for the defendants the record is such that we cannot say as a matter of law there was not a reasonable cause for the plaintiff's arrest.

In addition to alleging unlawful arrest, plaintiff's first cause of action also alleges false imprisonment. It is argued that even if the arrest be lawful in the first instance the plaintiff was unlawfully imprisoned because he was not promptly taken before a magistrate when apprehended by the sheriff at Glendive. No proof of Montana law was offered nor was the court asked to take judicial notice of the statutes of that state. We presume that the duty of a peace officer in Montana is the same as that prescribed by § 10,578, ND Comp. Laws 1913, which provides:

"When an arrest is made without a warrant by a peace officer or by a private person, the person arrested must without unnecessary delay be taken:

"1. Before the nearest or most accessible magistrate in the county or judicial subdivision where the arrest is made; or,

"2. If there is no magistrate in said county or judicial subdivision qualified to act, then before the nearest or most accessible magistrate authorized to act for the county or judicial subdivision where the arrest is made. A complaint stating the charge against the person arrested, must be made before such magistrate, as provided by section 10,533 of this code."

The plaintiff was arrested about noon and released from custody about five o'clock P. M. of the same day. The sheriff at Glendive promptly reported the arrest to the deputy sheriff of Morton county. During at least a portion of the time that the plaintiff was in custody, negotiations were under way at his request for his release. Such release was effected and he was permitted to return by train to Morton county. Under the circumstances here presented it does not appear as a matter of law that the plaintiff was detained for an unreasonable time without being brought before a magistrate.

What amounts to reasonable diligence in presenting a prisoner before a magistrate depends upon the peculiar facts of each case. Where there is a dispute in the evidence the question of whether there has been unnecessary delay on the part of the arresting officer is one of fact to be determined by the jury upon all circumstances attending the arrest and detention. Harris v. Atlanta, 62 Ga 290; Wood v. Olson, 117 Ill App 128. In this case the jury was warranted in determining that the plaintiff was not unlawfully detained in view of the fact that he sought and was granted permission to be released for the purpose of returning to Morton County. Keefe v. Hart, 213 Mass 476, 100 NE 558, 31 Ann Cas 716. Note in 79 ALR 27.

The plaintiff contends that § 10,567 providing for an arrest without a warrant is limited only to arrests made within the state of North Dakota and does not contemplate an arrest of a person in a foreign state and that a fugitive from justice from this state may not be ar-

rested in a foreign state without a warrant. Authority does not support this contention.

"The arrest may be made either by virtue of a warrant from a magistrate, or by an officer or private person, who may justify the arrest by showing that prima facie a felony or other crime has been committed by the prisoner in another state, or that he stands charged therewith." 22 Am Jur 251, Extradition.

Note in 46 Am St Rep 414. A charge sufficient to constitute the basis of a legal arrest in the state in which the alleged crime was committed will justify a peace officer in the asylum state in making an arrest without a warrant in the absence of a statute requiring a warrant. In this case it does not appear that there is such a statute either in this state or in Montana. The plaintiff cites § 11,153, ND Comp. Laws 1913, which provides for the arrest and commitment of fugitives from justice. This section adopts the proceedings provided for the arrest within North Dakota of persons who have committed public offenses. It neither specifically nor by implication prohibits the arrest of fugitives from justice without a warrant.

In a second cause of action the plaintiff seeks damages for injuries resulting from an alleged defamatory broadcast which he claims was authorized and instigated by the defendants. The broadcasting station is not made a party to this action. The broadcast complained of began: "Your attention, please, for the following special police bulletin from the sheriff's office at Mandan, concerning a stolen car."

Then followed a description of the automobile after which the announcer said: "Driver of car is one Paul Haggard. The last name is spelled H a g g a r d. He is thought to be headed for the west coast. Left Mandan this morning. Sheriff's office at Mandan reports they hold a warrant for his arrest."

The above was repeated after which the announcer continued: "Any one seeing this car or the driver please report to the sheriff's office at Mandan or the State Bureau of Criminal Identification in Bismarck."

The deputy sheriff of Morton county testified that after he had been given the information concerning the plaintiff and the car by the cashier of the bank he called the radio station in Bismarck for the

purpose of broadcasting a police bulletin. He acted in his capacity of deputy sheriff. Mr. Grewer, presumably an employee of the radio station, answered the telephone. The deputy told him that the sheriff's office in Mandan would like to have him put on a special police bulletin, that the sheriff's office was trying to locate Paul Haggard who was driving a car. After giving a description of the automobile the deputy said that the sheriff's office wanted to hold the driver and the car. The deputy further testified: "Mr. Grewer asked me two times 'Is it a stolen car?' and I repeated 'No' each time. I told him that it was mortgaged property, property subject to a lien that was taken out of the state and county; that it was not a stolen car."

An employee of the radio station testified with some hesitation to a different version of the conversation with the deputy sheriff. The verdict of the jury indicates that the question of fact presented by these different versions was resolved in favor of the deputy. The question thus presented to us is, assuming the broadcast be defamatory, does the unauthorized reference to the car as a "stolen car" render the deputy sheriff or the bank liable to respond in damages for defamation.

Liability for defamatory radio broadcasts is of necessity of comparatively recent origin since the medium of dissemination is of recent development. Some courts hold that such defamation is slander; others hold that it is libel. At least one text writer is of the view that defamatory broadcasts possess characteristics of both libel and slander but are so different from either that they should be considered as sui generis. Socolow, Radio Broadcasting, § 466; annotations in 82 ALR 1109; 104 ALR 877; and 124 ALR 982.

In all types of actions based upon defamatory utterances or publications regardless of the medium of dissemination, responsibility for the defamatory matter must rest upon the one from whom damages are sought else there can be no recovery. We find no case squarely in point and must, therefore, take what assistance we can from other cases by analogy. In Klos v. Zahorik, 113 Iowa 161, 84 NW 1046, 53 LRA 235, a defendant in a libel suit wrote an article to a newspaper which rewrote and changed the article before it was published. In the course of the opinion the court said: "It may here be said, in

a preliminary way, as furnishing a basis for our rulings on instructions, that while all persons who cause or participate in the publication of libelous matter are responsible in full for such publication, without apportionment as to their particular share, yet it must be shown that the publication or participation related to the libelous matter published, and not simply to the article published which contained the libelous matter. The distinction becomes very important in view of the evidence in this case, which tended to show, and from which the jury would have been justified in finding, that the article written by defendant and sent to the Chicago paper was merely the occasion of, or the basis for, the matter written by the editor which constituted the so-called libelous article, which was prepared and published without any authority whatever from the defendant. And it is too plain to require extended comment that, if the communication from defendant to the paper was in itself unobjectionable, then defendant could not be held liable for improper matter contained in the newspaper article, even though that article might have been to some extent instigated by or based upon defendant's communication."

In Summit Hotel Co. v. National Broadcasting Co. 336 Pa 182, 8 A (2d) 302, 124 ALR 968, it was held that a broadcasting company that leases its time and facilities to another whose agencies carry on the program is not liable for an interjected defamatory remark by a performer employed by the lessee where it exercises due care in the selection of the lessee and had inspected and edited the script and had no reason to believe that an extemporaneous defamatory remark would be made.

In this case it appears that the deputy sheriff of Morton county presented to the employees of the radio station a statement of facts involving the commission of a crime but that crime did not involve stealing a car. If an employee of the radio station, as the jury must have determined, either made an error, or assumed that the car in question was stolen, and worded his broadcast accordingly, neither the deputy nor the bank that sought the apprehension of the plaintiff would be liable for damages based upon defamatory matter inserted or interpolated by the employees of the radio station. The evidence, therefore, warrants the verdict of the jury with respect to the point

under consideration. See also Locke v. Gibbons, 164 Misc 877, 299 NYS 188.

It should also be observed that the communication to the broadcasting station was made by the deputy sheriff, a duly authorized peace officer. It is a matter of common knowledge that the radio generally performs an important function in the apprehension of criminals. The deputy, therefore, was not employing either an unauthorized or unusual means of communication.

The plaintiff presents twenty-four specifications of error involving rulings on evidence and instructions to the jury. Some of these alleged errors involve points of law that have already been determined in the course of this opinion. Others are without merit. Still others fatal to the verdict require further consideration.

Clarence Haggard, a brother of the plaintiff, testified by deposition which was read in evidence. Upon direct examination by plaintiff's attorney he told of two conversations that he had with Mr. Weinhandl, cashier of the defendant bank, and at least one conversation with Mr. Madsen, the bank president. All of these conversations took place after plaintiff's arrest but on the same day. They dealt with the reason for the arrest, the amount due on the conditional sales contract and the possibility of Clarence securing the money with which to pay off the contract. On cross-examination, the defendants' attorney undertook to go into these conversations at greater length. The court permitted extensive cross-examination upon the theory, no doubt, that the defendants were entitled to bring out all of the conversations that had been given in part on direct examination.

To the extent that the cross-examination was conducted within the limits of relevancy it was proper. This court has held that the extent of cross-examination even as to matters purely defensive rests in the sound discretion of the trial court and will not constitute grounds for a reversal of a judgment unless there has been a clear abuse of such discretion especially where the cross-examination is upon facts competent to be pursued under the issues in the case and where the questions are relevant to the general subject under litigation. Hellstrom v. First Guaranty Bank, 54 ND 166, 209 NW 212, 45 ALR 1487.

In this case the cross-examination was permitted to go beyond the liberal rule that has been adopted by this court. The cross-examination is too long to set out in full. Defendant's counsel asked the witness whether various things were discussed in the conversations with the bank officials. He asked the witness if the cashier had told him that the plaintiff on a previous occasion had borrowed an automobile and had driven it out of the state and was finally located and brought back from Idaho or Wyoming, to which the witness answered, "No, sir." We further quote from the deposition that was read in evidence:

"Q. Was that episode mentioned?

"A. No, sir.

"Q. Do you remember the episode I refer to?

"A. I do.

"Q. Did he say something to you about having been advised that Paul had borrowed a Fred Barreth's truck on the promise that he would split with Barreth the profits of a hay transaction—that he was going to go down and get some hay for Mrs. Love of Mandan, and that instead of doing so, he took Barreth's truck and went down to Linton and used it there for a couple of weeks and that Barreth was out not only the use of the truck, but also had lost what he, Barreth, had contributed for oil and gas for the transaction—did he tell you that?

"A. No, sir.

"Q. Was that mentioned?

"A. No, sir.

"Q. Does that episode mean anything to you?

"A. No, sir.

"Mr. Murray: I object. Incompetent and improper cross-examination and going into matters not involved in this lawsuit.

"A. No, sir.

"Q. Do you remember anything about his having borrowed Barreth's truck?

"Mr. Murray: Objected to as improper cross-examination.

"A. You couldn't tell me what year that was, could you?

"Q. No, but it was during the hay period. . . .

"Mr. Murray: Objected to as improper cross-examination.

"Q. . . . it was while we were having a shortage of hay.

"Mr. Murray: Objected to as having no bearing on the charges in the complaint.

"Mr. Sullivan: This shows the good faith, the good intent, and completely justifies the actions in all of them.

"A. I was not living in North Dakota during the hay period.

"Q. What I am getting at particularly—didn't Mr. Weinhandl or the President of the Bank direct your attention to these things at the time you discussed it with them?

"A. No, sir.

"Q. Did he direct your attention to any other episodes where any of the Haggard family found themselves in jail in connection with their operations?

"A. No, sir. No, he did not.

"Q. That was discussed?

"A. No, sir.

"Q. Did he discuss with you the trouble that Paul and some other members of your family got into with reference to kiting checks between Linton, Valley City and some Minnesota town?

"A. No, sir.

"Q. It was a fact that some of your family were arrested in that.

"A. No, sir. Earl Haggard was arrested for insufficient funds in Valley City. . . .

"Q. And at the time, the insufficient funds came about by virtue of kiting checks?

"A. Do these gentlemen understand what that means?

"Q. Kiting drafts, don't you know what that means?

"A. No, sir.

"Q. Do you know how these people operated that hay deal between Linton, Valley City and Minnesota?

"Mr. Murray: Objected to on the grounds that it is improper, incompetent questioning. Furthermore, it constitutes no defense to the charges involved in this action.

"A. I do not.

"Q. Didn't either Mr. Weinhandl or Mr. Madsen tell you that they had been advised that your family drew drafts on hay from one bank

452

and then went and called up a relation of yours and had that relation draw a draft on a Valley City bank to pay for the first draft that was drawn on Linton?

"Mr. Murray: ˙ Objected to on the grounds of improper cross-examination and going into a matter that constitutes no defense in this action.

"A.   Mr. Weinhandl did not mention anything in regard to that.

"Q.   Did ·the President, Mr. Madsen?

"A.   No, sir.

"Q.   No discussion of these things was had by you with any person who was connected with the bank?

"Mr. Murray:   Improper cross-examination and going into a matter that does not constitute any defense to the charges involved in this action.

"A.   No, sir.

The trial court overruled all of the objections noted above and also some further objections made by the plaintiff's attorney for the first time at the trial.

This cross-examination has several vices.   The questions dealing with the conversations between the witness and the bank officials are so framed as to be virtual statements of fact on the part of counsel. They are derogatory not only of the plaintiff and witness but also of other relatives who appear to have had no connection whatever with either the trial or the matter in controversy.   This cross-examination cannnot be justified on the theory that it tends to bring out knowledge on the part of the bank officials concerning facts that gave them reasonable cause to believe that Paul Haggard intended to abscond with the car.   Both the cashier and president testified later.   None of the matters referred to in the above-quoted examination were mentioned in connection with the information that the bank officers had at the time they sought plaintiff's arrest.   Mr. Weinhandl testified that A. C. Rausch told him over the telephone that   "We will have to get immediate action because I understand that he has had similar trouble," but details were not given.   The insinuations in the lengthy questions propounded by counsel concerning members of the Haggard family go beyond the limitations of proper cross-examination and when pursued

to the extent disclosed by this record would have a tendency to unjustly embarrass the witness and give the jury a bad impression of the Haggard family in general.

Interspersed throughout the cross-examination are several questions that have no connection whatever with the conversations to which the witness had testified. They deal exclusively with the witness' personal knowledge of matters wholly unconnected with the issues in the case. They have no bearing upon the amount of damages, the plaintiff's interest or the credibility of the witness. The cross-examination was pursued persistently and at great length. It goes beyond anything for which we can find justification in the books. It was clearly improper and prejudicial.

In Kaeppler v. Red River Valley Nat. Bank, 8 ND 406, 79 NW 869, the court considered the cross-examination of a witness that arose in the course of a trial of an action for malicious prosecution: "The first witness called by plaintiff was the sheriff who made the arrest. The testimony elicited by plaintiff was purely of a formal character. The witness was shown the warrant of arrest, and testified that under the warrant he arrested the plaintiff, and held him in custody for about thirty hours. Nothing further was asked by plaintiff. The warrant of arrest also directed the sheriff to seize the property of the plaintiff. On cross-examination this witness, over the repeated objections of plaintiff that it was not proper cross-examination, was permitted to testify as to what property he seized, where he found it, what condition it was in, and what plaintiff said as to where it was and how it came to be there. Of course, the object of this cross-examination was to show that the plaintiff was trying to conceal his property, and that, therefore, defendant had probable cause for causing his arrest. This was a vital point in the defense, but had been in no manner adverted to on the direct examination. We know that much discretion should be given to trial courts in matters of the kind, but still it is a legal discretion, and subject to control. Evidence of this damaging character, coming from the lips of the party's own witness, must have been highly prejudicial. It was outside the ordinary limits of cross-examination, and its admission was reversible error, which necessitates a new trial."

In State v. Phillips, 55 ND 269, 213 NW 355, this court reversed a conviction for assault and battery because prejudicial error was committed by permitting an important witness for the defendant to be cross-examined in such a manner as to charge by innuendo that he had rendered improper services at other trials and was in attendance at the trial in question for the purpose of rendering similar services. In the case before us, the cross-examination goes even to the extent of inquiring into the conduct of relatives of the plaintiff and the witness, who had no connection with the trial. We can reach no other conclusion but that the cross-examination to the extent here presented went beyond the trial court's discretion to permit and constiutes reversible error.

Further error is specified with respect to the instruction given by the trial court to the jury that "the burden is upon the plaintiff to show by a fair preponderance of the evidence. an absence of probable cause." It is argued that the rule is the reverse of that stated in this instruction and that in an action for false arrest without a warrant the burden is on the arresting officer to show that he had probable cause for making the arrest and that it is incumbent upon him to both plead and prove probable cause in justification of his act.

The defendants assert that the instruction is correct. There is some authority that supports the defendants' position, however, the great weight of authority is to the contrary.

In an early California case, People v. McGrew, 77 Cal 570, 20 P 92, the court passed upon the correctness of an instruction given in a criminal case involving a prosecution for false imprisonment and it was held that the imprisonment being proven it devolves upon the defendant to prove that he was justified in what he did and that the imprisonment was lawful. This rule has been followed in several later cases involving civil actions wherein it is repeatedly said that the arrest being shown the burden of proving probable cause is upon the defendant. Sebring v. Harris, 20 Cal App 56, 128 P 7; Mackie v. Ambassador Hotel & Invest. Corp. 123 Cal App 215, 11 P (2d) 3; Collins v. Jones, 131 Cal App 747, 22 P (2d) 39.

There are cases from many jurisdictions holding that where an arrest is made without a warrant the burden is upon the defendant in

an action for false imprisonment to show reasonable grounds or probable cause for making the arrest. Hobbs v. Illinois C. R. Co. 182 Iowa 316, 165 NW 912; Fox v. McCurnin, 205 Iowa, 752, 218 NW 499; McAleer v. Good, 216 Pa 473, 65 A 934, 10 LRA (NS) 303, 116 Am St Rep 782; Marshall v. Cleaver, 4 Penn (Del) 450, 56 A 380; Snyder v. Thompson, 134 Iowa 725, 112 NW 239; Edger v. Burke, 96 Md 715, 54 A 986; Snead v. Bonnoil, 166 NY 325, 59 NE 899; Franklin v. Amerson, 118 Ga 860, 45 SE 698; Black v. Marsh, 31 Ind App 53, 67 NE 201; Jackson v. Knowlton, 173 Mass 94, 53 NE 134.

In Raymond v. Corrigan, 37 SD 609, 159 NW 131, the defendant demurred to a complaint upon the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was based on the theory that since the defendant, being a peace officer, was empowered by statute to arrest and imprison people without a warrant the complaint must allege that the arrest was made without probable cause. The South Dakota statute is similar to our § 10,567, ND Comp. Laws 1913. In overruling the demurrer the supreme court of South Dakota said:

"These two sections authorize arrests to be made without a warrant in certain emergencies; but in order that a defendant in an action like this may avail himself of such provisions, he must allege and prove facts showing the existence of one or more of the emergencies enumerated in said sections. This can be done only by answer.

"A plaintiff in an action for false imprisonment is not obliged to anticipate and negative all the facts that may constitute a defense to his cause of action. Just v. Martin Brothers Co. 159 NW 44. If matters in justification of an alleged illegal arrest exist, they must be affirmatively shown by the defendant in his answer, and not negatived by the plaintiff in his complaint, and the burden of proof is on the defendant to show the existence of facts constituting such justification."

The fact that a complaint in an action for false imprisonment alleges want of probable cause does not impose upon the plaintiff the burden of proving it. Pritchett v. Sullivan (CCA 8th) 182 F 480; 22 Am Jur 420, False Imprisonment; Neves v. Costa, 5 Cal App 111,

89 P 860; Hight v. Naylor, 86 Ill App 508; Enright v. Gibson, 219 Ill 550, 76 NE 689; Johnson v. Von Kettler, 84 Ill 315; Ackroyd v. Ackroyd, 3 Daly (NY) 38.

In support of the instruction the defendants cite Guild v. More, 32 ND 432, 155 NW 44, wherein this court held that the burden of proof is determined by the pleadings and never shifts but must be carried by the responsible party throughout the case. This applies to the essential elements of either a cause of action or a defense thereto. In an action for false imprisonment want of probable cause is not an essential element of the cause of action. The plaintiff is not required to either plead or prove it in order to make out his case. This rule is supported by a long list of authorities found in a note in 19 ALR p. 671. See also 22 Am Jur 424, False Imprisonment.

The challenged instruction was contrary to the overwhelming weight of authority and constituted prejudicial error.

The errors that we have pointed out resulted in a denial of a fair trial to the plaintiff. The judgment is reversed and a new trial granted.

CHRISTIANSON, BURR, BURKE, and NUESSLE, JJ., concur.