**PORT HURON BROADCASTING COMPANY (WHLS), In re Application, For Renewal of License.**

Before the
Federal Communications Commission
Washington 25, D. C.

•Docket No. 6987.   File No. B2-R-976

Adopted January 30, 1948

## PROPOSED DECISION

By COMMISSIONER HYDE:

The Commission has before it a petition of Harmon LeRoy Stevens and Herman LeRoy Stevens, doing business as Port Huron Broadcasting Company, licensee of radio station WHLS, Port Huron, Michigan, requesting that the Commission reconsider its action of November 21, 1945, designating the application of WHLS for renewal of license for hearing, and upon such reconsideration to grant the application without hearing. The petition alleges that all pertinent information concerning the complaints which caused the renewal application to be designated for hearing are before the Commission, and that accordingly the holding of a hearing would serve no useful purpose.

The facts leading up to the designation of the WHLS application for hearing are not in dispute and may be summarized as follows:    Carl E. Muir, T. Nelson Tobias and Harold C. Davis, among others, were candidates for election to the office of City Commissioner in the Port Huron Municipal election held April 2, 1945.    On March 5, 1945, Commissioner Muir, then an announced candidate for re-election, was granted time without charge to broadcast a speech over station WHLS in which he discussed a proposed bond issue for a filtration plant, which was one of the leading issues in the election campaign. In his speech he presented his views as being opposed to those of the other members of the City Commission but mentioned

no names. He was introduced to the radio audience by one Eugene Black, an attorney and associate of Mr. Muir, who in the course of his remarks, attacked by name a Mr. Mactaggart, a member of the City Commission, as well as the City Manager, neither of whom were candidates for election as City Commissioner nor any other office at the April election. Neither Muir, Black, nor the station's announcer referred in any manner during the course of the broadcast to Mr. Muir's candidacy, and the station announcement at the end of the program stated that any responsible party who desired to present conflicting views concerning the bond issue would be allotted an equal amount of time. After the broadcast, Mr. Mactaggart informed Mr. Herman L. Stevens, co-owner of the station, who was at that time a member of the City Commission, and a candidate to succeed himself in the April election, that he considered some of Mr. Muir's statements actionable, but that in view of his friendship for Mr. Stevens he would take no legal action as long as Mr. Stevens permitted no further attacks on him to be made.

Subsequently, time was purchased by Black for a series of political broadcasts to be made by Muir as a candidate for reelection. However, when the script for the first broadcast was received it contained further attacks on Mr. Mactaggart and the then dominant element on the City Commission. Mr. Harmon Stevens showed the script to Mr. Mactaggart who stated that in his opinion some of the statements contained in the script were untrue and could be so proved. Consequently, Mr. Stevens determined to cancel all of Mr. Muir's scheduled broadcasts, and to refuse to sell or give time to any candidate for election to the City Commission. As a result, scheduled broadcasts by Messrs. Tobias and Davis, also qualified candidates, were cancelled, and no further time was made available for political speeches by any candidate, although the station publicly announced that Muir or anyone desiring to do so might have time to discuss public and civic issues in a "round-table" or "forum-type" program presented under the auspices of a recognized nonpartisan organization and presenting both points of view.

Following this action by the station, both Muir and Davis submitted formal written complaints to the Commission charging station WHLS with violations of Section 315 of the Commissions Act and requesting that the station license of station WHLS be revoked or not renewed. On November 21, 1945, the Commission designated the application for renewal of license of radio station WHLS for hearing on the following issues:

(1)   Whether the refusal of the said licensees to permit their facilities to be used for the scheduled broadcast by the said Muir constituted an act of censorship by the said licensees in violation of the provisions of section 315 of the Communications Act, and

(2)   Whether the refusal of said licensees to permit their facilities to be used by any of the candidates referred to above on the ground that the facilities were not to be used by any candidate constituted a violation of the provisions of section 315 of the Communications Act of 1934, as amended.

The case raises squarely one of the most crucial problems with respect to political broadcasts under Section 315 of the Act, namely, whether or not the provision of the section denying the licensee the right to censor the "material" of a broadcast within the meaning of Section 315 prohibits the station from censoring or deleting material in radio speeches by candidates for public office which they might reasonably believe to be libelous or to subject their station to an action for damages.   Section 315 of the Communications Act reads as follows:

If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station, and the Commission shall make rules and regulations to carry this provision into effect:   **Provided,** That such licensee shall have no power of censorship over the material broadcast under the provisions of this section.   No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate.

In determining the issue before us we do not believe it necessary to determine whether or not Muir's first speech on March 5, 1945, was or was not a political speech within the meaning of the section.   For on the basis of the undisputed facts in the case, we believe it clear that the cancellation of Muir's speech scheduled to be broadcast on March 22, 1945, was an act of censorship of a broadcast by a candidate for public office, and not merely the consequence of a change in policy on the station's part resulting in a decision to eliminate all political broadcasts by candidates for city commissioner. The station had adopted a policy of selling time to the various candidates for city commissioner; it had already arranged

not only for a series of talks by Muir, but also for programs by Davis and Tobias. The Muir broadcast was refused only after the station management had examined his first script, and had shown it to Mr. Mactaggart, who stated that some of its remarks were demonstrably untrue. The sole reason for the cancellation of the series of broadcasts by Mr. Muir was because of the allegedly libelous nature of the script of the first of the series. Thus, the letter from Mr. Harmon L. Stevens to Mr. Muir, explaining the station's actions, states very clearly that "the script presented by you which I rejected was not suitable for broadcasting **and it was refused for reason."** (Emphasis supplied.) The reason for the subsequent refusal to sell time to Davis and Tobias was, as the station's letters to them make clear, merely to protect the station's action in regard to Mr. Muir.

It is clear that the most effective means of censorship is complete suppression of the offending item. It was, thus, no less an exercise of censorship when the station refused to carry the program by Mr. Muir, which it had contracted for, because of the allegedly libelous nature of some of the material it contained than if it had permitted the broadcast to be made but had insisted on the speaker making changes and deletions in his script to conform with the desires of the radio station. Nor can such censorship be excused on the claim that it represents a proper exercise of the station's option under Section 315, to refuse the use of its facilities to all candidates. The privilege of a station to refrain altogether from the carrying of political broadcasts by candidates for any office or offices in any particular election was certainly not intended to operate as an exception to the proviso prohibiting any censorship of specific political broadcasts already scheduled and arranged. It was, rather, designed to insure that broadcast licensees retain their authority and responsibility to make an independent determination as to the extent to which their broadcast schedule should be devoted to any particular type of radio program. Both the proviso and the last sentence of Section 315 must be given meaning. But to hold that a station can adopt a policy of carrying broadcasts by the candidates for a particular public office, contract with the candidates to make such broadcasts, and then withdraw from the field of political broadcasts when they examine the script of the first scheduled program and find its contents displeasing, would deprive the proviso of a substantial part of its meaning and import in a manner which is not required to give the last sentence of Section 315 meaning or effective scope for appli-

cation. Thus both the proviso and the last sentence of Section 315 are given full recognition in the conclusion that licensees are free, in the exercise of their discretion, to refuse to carry altogether broadcasts by all political candidates for any given office in any particular election, but, having once exercised their discretion to carry such programs, may not censor.

The question remains whether the prohibition of Section 315 "that such licensee shall have no power of censorship over the **material** broadcast under the provisions of this section" is applicable in the case of broadcasters who require persons making political speeches falling within the provisions of Section 315 to make changes and alterations or deletions in the prepared text to eliminate material which the station believes is possibly libelous or slanderous or might tend to subject the station to an action for damages. This is a question which has proved to be perplexing over the years to Congress, the Commission and the broadcasters themselves. But it is a subject of vital significance which goes to the very heart of the problem of insuring a fair and balanced discussion of the relative merits of candidates for political office.

It is important in considering this matter to determine just what would be the inevitable consequences of accepting the view that a licensee should have the power to require candidates to delete "possibly libelous matter." In most political campaigns there are one or both of two basic issues before the public. On the one hand there is the question of the relative moral, intellectual and political integrity of the opposing candidates. On the other hand, in most cases the record of the persons and party in office is up for the voters' inspection. Thus the question of the personal honesty of one of the candidates or the motives behind the actions of one group of office holders may be, and often is, the principal area of contention between opposing candidates. This is not merely a question of "mud-slinging"; the legality of certain questioned actions by one of the contesting parties in the election may well be the particular issue upon which the election does and should hang. These issues can only be brought before the public by statements of opposing groups. Such statements may or may not be libelous or slanderous. That will depend, in most cases, on whether the statements are true or false. But in every case of serious charges there is a possibility that the statement might be libelous or, even if not in fact libelous, might subject the station to suit.

This means that if licensees are going to take it upon

themselves to censor or restrict the broadcast of libelous material, they must either adopt a policy of requiring the elimination of all matter containing serious charges concerning the activities of opposing candidates or parties, which would seriously limit the effectiveness of radio broadcasting as a medium of political expression, or they must, in effect, set themselves up as the sole arbiter of what is true and what is false, what is in fact libel and what is not, an exercise of power which may be readily influenced by their own sympathies and allegiances. The Commission does not believe that it was the intent of Congress to give the licensees any such power or responsibility with respect to political broadcasts.

The assumption of a right to censor "possibly libelous" matter, or statements "which might subject the station to suit" would give to radio stations a positive weapon of discrimination between contesting candidates which is precisely the opposite of what Congress intended to provide in this section. Most of the complaints received by the Commission concerning alleged violations of Section 315 concern instances in which the station has insisted on the deletion of matter which it alleged might subject the station to suits for damages. If the criterion for such censorship it to be merely whether the questionable item might possibly subject the station to suit, a category which as we have seen can be expanded to include almost every conceivable charge against the opposition, the opportunity for favoritism and discrimination would be omnipresent.

The legislative history of Section 315 makes it abundantly clear that Congress did not intend licensees to have any right of censorship over political broadcasts. That section was taken over without change from Section 18 of the Radio Act of 1927, 44 Stat. 1162. In the Senate draft of the bill Section 18 contained both the existing prohibition against any censorship by the licensee and a provision that a licensee "shall not be liable to criminal or civil action by reason of any uncensored utterances thus broadcast." See H. R. 9971, Sec. 4, 69 Cong. 1st Sess. as reported with Senate amendments, May 6, 1926. In the course of the Senate debates doubt was expressed principally by Senator Fess of Ohio as to the power of Congress to make provision for a complete exemption from liability. 67 **Cong. Rec.** 12503. But the Senate debates reveal an unqualified agreement as to the objective to be attained by the section that licensees should be prevented from censoring political speeches. 67 **Cong. Rec.** 12356, 12502-12505. The bill as passed by the House had contained no provision with

respect to political broadcasts and in conference the express provision for absolution from liability was eliminated, although the prohibition against any censorship remained. No reason was given in the conference report (H. Rept. 1886, 69th Cong. 2nd Sess.), nor on the floor of either the House or Senate for the deletion nor was any suggestion made that the elimination of the additional language was in any way meant to weaken or limit the blanket prohibition against any censorship.

Subsequent to the passage of the Radio Act the problems presented in connection with political broadcasts have received considerable attention by various congressional committees. During such hearings fear was occasionally expressed both by witnesses and by certain members of the congressional committees that the language of the Act as written did not afford protection to the licensees from actions for damages. As a result two suggestions have been periodically advanced to cure the alleged deficiency in the existing law. One group has suggested the enactment of a federal pronouncement, similar to that contained in the original draft of Section 18 of the Radio Act, expressly absolving the station licensee of any liability arising out of any statements libelous or otherwise broadcast by a qualified candidate for public office. Others, on the other hand, have supported amendments which would modify the existing language expressly to allow licensees to delete from the scripts of political speeches material which is or may be libelous. But at no time during the course of any of these congressional hearings has it ever been suggested that it was the purpose of Congress in enacting Section 18 of the Radio Act to do less than impose a complete bar to all censorship, including a bar on deletion of libelous remarks.[1] And Congress has not only failed to change or modify in any respect the blanket prohibition on any censorship of political

1. See, particularly, Hearings before Senate Committee on Interstate Commerce on H. R. 7716, 72nd Cong. 2nd Sess. (1932). pp. 9-11 (Testimony of Henry A. Bellows, President, National Association of Broadcasters); Hearings before Senate Committee on Interstate Commerce on S. 2910 (Communications Act of 1934), 73rd Cong. 2nd Sess. (1934), pp. 63, 66-67; S. 814, Section 11, 78th Con. 1st Sess., (express authority to delete libelous material), and Hearings on S. 814 before Senate Committee on Interstate Commerce, 78th Cong. 1st Sess., (1943), pp. 63-65, 162, 945, 950-951; and S. 1333, 80th Cong. 1st Sess., Sec. 15 (declaration of immunity of licensees from suit arising out of libelous matter broadcast by candidate for office), and Hearings before Senate Committee on Interstate Commerce, June 1947. See also H. R. 9229 and 9230, 74th Cong. 1st Sess. (1935) (declaration of immunity of licensees from suit)—No hearings held.

speeches to correct the alleged deficiencies in the language, but in the Communications Act of 1934 specifically reenacted the language of Section 18 of the Radio Act, without change, although the alleged danger under existing language from actions against licensees for damages arising out of libelous remarks made during the course of a broadcast by a candidate for office was expressly called to Congress's attention during the course of hearings on the Communications Act Bill.[2]

Accordingly, we are of the opinion that the prohibition of ▌Section 315 against any censorship by licensees of political speeches by candidates for office is absolute, and no exception exists in the case of material which is either libelous or might tend to involve the station in an action for damages.

The argument has been advanced that such an interpretation of the Act cannot be correct, because it would leave the licensee in the completely untenable position of being forbidden to censor political speeches containing libelous or other actionable material and, at the same time, subject to damages for any libelous or actionable material in such broadcasts. But this argument not only has no basis in the legislative history of the Section as explained above, but is based on an assumption of the licensee's liability for the remarks made by political candidates speaking under the section which we do not believe is tenable. For as we read the provisions of Section 315, the prohibition contained therein against censorship in connection with political broadcasts appears clearly to constitute an occupation of the field by federal authority, which, under the law, would relieve the licensee of responsibility for any libelous matter broadcast in the course of a speech coming within Section 315 irrespective of the provisions of state law.[3]

The Supreme Court in the recent case of **Sola Electric Co. v Jefferson Electric Co.**, 317 U. S. 173, has had the occasion to consider the whole problem of the relationship between federal statutes and conflicting state statutes or common law rules. The point was raised in a suit involving a challenge by a licensee under a patent of the validity of the patent. The conflict was between the familiar common law rule that a licensee under a patent is estopped to challenge the validity

2. Hearings before Senate Committee on Interstate Commerce on S. 2910, 73rd Cong. 2nd Sess. (1934), pp. 63, 66-67.

3. The actual speaker, of course, is completely liable for the contents of his remarks. Section 315 of the Act does not affect this liability in any manner nor protect the speaker against civil actions for libel or slander or criminal prosecutions arising out of his violation of any federal or state law.

of the patent and the prohibition of the Sherman Act against price fixing, which the license agreement attempted to accomplish. The Supreme Court held that provisions of the federal statute governed, saying (p. 176):

"It is familiar doctrine that the prohibition of a federal statute may not be set at naught, or its benefits denied, by state statutes or state common law rules. In such a case our decision is not controlled by **Erie R. Co. v Tompkins**, 304 U. S. 64. There we followed state law because it was the law to be applied in the federal courts. But the doctrine of that case is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law. **Royal Indemnity Co. v United States,** 313 U. S. 289, 296; **Prudence Corp. v Geist**, 316 U. S. 89, 95; **Board of Comm'rs. v United States**, 308 U. S. 343, 349-50; cf. **O'Brien v Western Union Telegraph Co.**, 113 F. 2d 539, 541. When a federal statute condemns an act as unlawful, the extent and nature of the legal consequences of the condemnation, though left by the statute to judicial determination, are nevertheless federal questions, the answers to which are to be derived from the statute and the federal policy which it has adopted. To the federal statute and policy, conflicting state law and policy must yield. Constitution, Art VI, cl. 2; **Awotin v Atlas Exchange Bank**, 295 U. S. 209; **Deitrick v Greaney**, 309 U. S. 190, 200-01."

The case of **O'Brien v Western Union Telegraph Co.**, 113 F. (2d) 539 (C. C. A. 1), cited by the Supreme Court, is even more closely in point. That case involved a suit for damages in connection with a telegram transmitted over the facilities of Western Union which libelled the plaintiff. The Court held that the company's liability for transmitting messages in interstate commerce must be determined by federal statutes rather than state or local law. The Court said (p. 541):

In determining the privilege of the defendant to transmit the libelous message in question, we are not bound by the common law or statutes either of Massachusetts, where the message originated, or of Michigan, where it was delivered. The telegram was an interstate message. It was transmitted by common carrier engaged in interstate communication by

wire. The telegraph company is subject to the Communications Act of 1934, 48 Stat. 1064, 47 U. S. C. A. §35, 151 et seq., and to regulations thereunder by the Federal Communications Commission. Under §202(a) of the Act, defendant is forbidden to make any unreasonable discrimination in charges, practices, facilities or services, or to subject any person to unreasonable prejudice or disadvantage. Civil and criminal penalties are provided for violation of these provisions. §§202(c), 501-505. §§206, 207 cover liability for damages where private injury results from any unlawful act or omission. Congress having occupied the field by enacting a fairly comprehensive scheme of regulation, it seems clear that questions relating to the duties, privileges and liabilities of telegraph companies in the transmission of interstate messages must be governed by uniform federal rules. This conclusion is fortified by decisions under the Interstate Commerce Act, 49 U. S. C. A. §1 et seq., which was applicable to telegraph companies prior to the passage of the Communications Act of 1934.

The Court concluded that in the light of the foregoing statutory provisions, there was no responsibility for libel on the part of the telegraph company in transmitting the libelous message.

The same statute which regulates telegraph companies regulates the activities of the licensees of radio broadcast stations. Unlike telegraph companies which as common carriers are specifically required to carry all messages presented to it, radio stations under the provisions of the Communications Act in general are given freedom, within the broad limits of their duty to insure that their overall operation is in the public interest, to determine which programs they will carry and which they will not and the exact content of such programs. But in the case of political broadcasts by candidates for public office, no such freedom is delegated to the station owners. Once they determine to carry broadcasts by a candidate they are obligated to offer, without censorship, equal opportunities to use their facilities to all candidates. The conclusion is inescapable that Congress has occupied the field in connection with responsibility for libelous matter in broadcasts under Section 315 as fully as it did with respect to responsibility for libelous material in telegrams transmitted in interstate messages by a telegraph company. In the case of the radio station operating under Section 315 as in that of the telegraph company transmitting interstate messages the requirement of federal law is clear that the message be broadcast as submitted. Hence, the station like the telegraph

company is also relieved by operation of federal law from any responsibility for libelous material.[3]

It follows from what has been said that the action of the station was in violation of Section 315 of the Communications Act. We realize, however, that the principles of law which have been enunciated in this opinion have previously been the subject of much confusion and that previous to this opinion there has been no clear pronouncement on the subject by the Commission, nor have there been any rules or regulations specifically covering the situation. Therefore, since there is no evidence that the conduct of the licensee was a deliberate or wilful attempt to violate the provisions of the statute, we do not believe that a denial of the renewal of license is required. This conclusion is reenforced by the statement in the licensee's petition that since the election in question the station has not refused time to any candidate and that in the future the station intends to avoid violation of Section 315.

In the light of the foregoing the Commission is of the opinion that a regular renewal of license should be issued for the operation of Station WHLS. Accordingly, it is proposed to grant the petition of Port Huron Broadcasting Company, Docket No. 6987, File No. B2-R-976, and to issue a regular renewal of license.

FEDERAL COMMUNICATIONS COMMISSION

T. J. Slowie

Secretary

Commissioner Hyde concurs in the conclusion of the Commission that the action of the licensee in this case constituted an act of censorship in violation of Section 315 of the Communications Act. He also agrees that because of the previously unsettled state of the law and the overall meritorious service of the applicant, a renewal of license should be granted.

---

3. See *Josephson* v *Knickerbocker Broadcasting Co.*, 38 N. Y. Supp. (2d) 985, *cf. Summit Hotel* v *National Broadcasting Company*, 8 A. (2d) 302 (Penna. Sup. Ct. 1939). The contrary result has been reached in *Sorensen* v *Wood*, 123 Nebr. 348; 243 N. W. 82 (1932), appeal dismissed *sub nom. KFAB Broadcasting Co.* v *Sorensen*, 290 U. S. 599. The *Sorensen* case, which is the only case of which the Commission is aware which holds licensees liable for the remarks made by candidates for public office using their facilities, was decided before the Supreme Court's decision in the *Sola Electric* case and is inconsistent with the principles there laid down. It is significant that the Supreme Court dismissed the appeal in the *Sorensen* case on the grounds that the judgment of the Nebraska Supreme Court had been also based on a non-federal ground adequate to support the decision and that therefore no review of the federal issue was necessary.

He believes that the language and legislative history of Section 315 make it clear that no licensee can censor any material broadcast by candidates for public office for any reason whatsoever. He feels, however, that the question of whether a licensee is to be held liable for libelous or slanderous remarks made by candidates for public office over his station, in view of their lack of control over such broadcasts, is a matter for decision by Congress or the courts and not by the Commission. He therefore expresses no opinion on this question.

See Section 1.854 of the Commission's Rules of Practice & Procedure.
Adopted: January 30, 1948
RELEASED: January 30, 1948.

## SEPARATE OPINION OF COMMISSIONER JONES

By COMMISSIONER JONES:

I believe the decision of the Commission in this case requires no more than a finding and conclusion that the broadcast over WHLS by City Commissioner Muir on March 5, 1945, was not a political broadcast within the meaning of Section 315 of the Act, that the refusal of the station to permit subsequent speeches by any of the candidates involved did not constitute an act of censorship and that, therefore, the application for renewal of license for Station WHLS should be granted.

Further, I believe that those portions of the majority opinion which hold that (1) WHLS committed an act of censorship prohibited by Section 315 when it refused to carry any political speeches by any of the candidates and that (2) all radio broadcast stations are relieved by operation of Federal laws from any and all responsibility for libelous material included in political broadcasts carried under Section 315 not only are unnecessary to a proper decision in this case but also extremely dangerous.

While the majority opinion stated that it is not necessary to determine whether or not Muir's first speech on March 5, 1945, was or was not a political broadcast within the meaning of the statute, I believe that such a determination is necessary in this case or, at least, highly desirable, in the light of the established facts.

Carl E. Muir, an announced candidate to succeed himself as City Commissioner of Port Huron, attacked a proposed bond issue for a city filtration plant. Mr. Eugene Black, associate

of Muir, who introduced him, attacked the city manager and a Mr. Mactaggart, not candidates. Neither Muir, Black, nor the station announcer referred to Muir's candidacy. The station announcer, preceding and following this broadcast, stated that it was provided **without charge as a public service** and that any responsible person or organization would be given an equal amount of time to discuss the subject. The undisputed fact is no one requested free time to present conflicting views on the bond issue.

Since no qualified candidate demanded free time to answer or support Muir's point of view at the time of the controversy, they must not have considered it of political advantage to candidate Muir or they would have availed themselves of the chance to advance their own candidacies in the same manner. One can only conclude that no candidate **at the time of the controversy** considered this broadcast of March 5, 1945, a political campaign broadcast within the meaning of Section 315 of the Act.

If the free-time broadcast of Muir then under the circumstances stated is within the provisions of Section 315 of the Communications Act, let me assume hypothetically the President is an announced candidate to succeed himself and relate such reasoning to today's news: it might be held that an address by the President arguing for additional relief to devastated and suffering nations, or universal military training and the like are also within the statute. Even the call of the President to convene Congress might be regarded as a political broadcast, because food for the hungry of Europe and inflation on the home front presumably might be an issue in the next campaign. Ceremonies of a Department of the Interior official dedicating a dam might be a political broadcast because appropriations support or denial by the respective parties might be a campaign issue upon which the party opposing the National administration in power would be entitled to free time.

Obviously, such reasoning could easily lead to unreasonable demands of time upon the broadcast industry and would require every station licensee to be a political oracle, that is, once a candidate speaks on a public question, to guess at once, even when other candidates fail to take issue therewith, whether this Commission subsequently will find that it was a political issue. I reject such assignment of responsibility upon the licensee.

Under the Act the licensee has the positive unqualified responsibility of serving the public interest as a matter of

law. The law provides that the Commission may grant no license to a new station 'nor renewal of license to an existing station unless it finds that such action will serve the public interest. Let us look at this licensee on March 22, 1945, the date he cancelled the paid broadcast of Muir, Tobias and Davis, candidates for City Commissioner, and his conduct in relation to the public interest. The licensee clearly considered the Muir broadcast on the bond issue a public service feature and gave, rather than sold, time to Muir to discuss this issue. After Muir and Black spoke on March 5, the station announcer referred to the talks as "discussion of city affairs" and repeated the statement that the time was provided "without charge as a public service" and that a like amount of time would be given to other persons or organizations to discuss the matter. Assuming arguendo that the licensee considered the first Muir broadcast a political broadcast within the meaning of the Act, in Section 315 the phrase "afford equal opportunities to all other such candidates" has been uniformly construed by the Commission to mean that the other candidate is entitled to listening time of equal value and duration under like conditions. Muir's free time of March 5 can only be brought into controversy for other candidates' free time demand or entitlement. Can it be said the licensee sought to influence the election in this manner? The station certainly does not have the responsibility of drafting, demanding or kidnapping a responsible party or even a legally qualified candidate to take issue with Muir before it can be said to operate the station in the public interest. In relation to the public interest the licensee, in my opinion, was not required on the 22nd of March to let Muir, Tobias and Davis use the broadcasting station for purely partisan political speeches in their own behalf. At this juncture the station has been eminently wise, impartial and fair in affording opportunity to "any responsible citizen" to avail himself of equal free time to present conflicting views, even granting the filtration plant bond issue was to become "one of the leading issues" in the campaign.

I therefore conclude that this Muir free broadcast of March 5, 1945, was not use of a broadcasting station within Section 315 of the Act for the reason that no candidate for City Commission, including the complainants, considered it a political broadcast. The station licensee in every respect involving the first broadcast of Muir operated in the public interest, convenience and necessity.

Having determined that the first broadcast of Muir on March 5, 1945, was not a political broadcast, there was no

"use of the station by a qualified candidate" within the meaning of Section 315 giving rights to Muir, Tobias, or Davis to subsequently use the station facilities of WHLS in support of their respective candidacies under the plain unequivocal terms of the statute as follows:

"No obligation is hereby imposed upon any licensee to allow the use of its station by any such candidate."

The majority find that an act of censorship is committed by a station when it refuses to carry any political speeches by candidates for public office. It seems clear to me that such a conclusion is a direct contradiction to the will of Congress as specifically expressed in that portion of Section 315 above quoted. The fact that the conclusion of the majority was arrived at by taking into consideration an apparent fear on the part of the station that the broadcast of the candidates' speeches might subject it to libel actions and that the station had previously followed the practice of accepting political speeches has nothing to do with the clear and unqualified right granted to stations by the statute to refuse to make any time available for such broadcasts. This is a right specifically granted and may be exercised regardless of why it is exercised or what the practice of the licensee has been in the past. The right of the licensee to **carry no political broadcast** is not **diluted** by any decision he might have made or had in mind up to the time such legal right is exercised. To decide otherwise is to defeat the clearly expressed will of the Congress and to substitute therefor the conclusion of an administrative agency as to what the law should provide.

Moreover, I cannot agree that the making of contracts between the candidates and the station and the submission of scripts changes the legal situation under the terms of Sec. 315 of the statute. Sec. 315 specifies "use" and I believe the definition of that word is clear. As applied to a radio station it must mean a program broadcast. It may be that the terms of the contract here involved afforded possibility of legal action for damages against the station when the contracts were cancelled. Nevertheless, there was no "use" of the station by any of the candidates within the terms of Sec. 315 of the Act.

Also, there could have been no censorship arising from a refusal to carry the speeches because of a previous submission of scripts. The prohibition against censorship over material broadcast by political candidates contained in Sec. 315 arises

only when a licensee has permitted the station to be used by such candidate. In this case there never was any "use" by any candidate. Therefore, there could have been no censorship.

Even assuming arguendo that Muir's March 5, 1945, broadcast was political, the Commission lays down the following broad and far-reaching principles of law to govern all AM, FM and television licensees:

(1) The licensee must broadcast libelous or possibly libelous portions of partisan political speeches by qualified candidates if it has once indicated that it will accept such broadcasts although none has been made.

(2) The licensee is relieved from financial responsibility for libelous material broadcast by such candidates.

There is clearly no issue before the Commission on either one of these legal points. In the case at bar the licensee refused to carry any of the candidates' partisan political broadcasts. The licensee never attempted to delete **any portion** of the Muir second broadcast which he thought was libelous. There is no party or complainant alleging libel by a candidate asking the Commission for an adjudication of his rights, the liability of the licensee or the award of punitive or actual damages for his injury.

There is a further cogent reason why the majority opinion should not issue on these two points of law and a third point of law according to my position which I have heretofore discussed and will restate as follows: i. e. that WHLS committed an act of censorship prohibited by Section 315 when it refused to carry any political speeches by any of the candidates. The majority casts aside the legal doctrine on these three points of law which are to govern hereafter all licensees and exonerates WHLS for reasons wholly unrelated legally to the gravamen of the opinion. I conclude that the majority is rendering a decision on these broad and far-reaching principles of law which it is not now called upon to decide. I further conclude that these three rulings in the majority opinion are dicta. In enunciating the dicta the majority is using its quasi-judicial processes to accomplish a rule-making function. So that my silence on the points disposed of may not be interpreted as acquiescence therein, I feel that I must state my position in detail on this "judicial legislation".

The Commission has the authority, even the mandate of Congress, to adopt rules and regulations to carry Section 315 into effect. The only rules that it has made to implement Section 315 relating to the instant case define the candidates who are covered by said section as follows:

Sec. 3.422 Definitions.—A 'legally qualified candidate' means any person who has publicly announced that he is a candidate for nomination by a convention of a political party or for nomination or election in a primary, special, or general election, municipal, county, state or national, and who meets the qualifications prescribed by the applicable laws to hold the office for which he is a candidate, so that he may be voted for by the electorate directly or by means of delegates or electors, and who

"(a)  has qualified for a place on the ballot or

"(b)  is eligible under the applicable law to be voted for by sticker, by writing in his name on the ballot, or other method and (1) has been duly nominated by a political party which is commonly known and regarded as such, or (2) makes a substantial showing that he is a **bona fide** candidate for nomination or office, as the case may be."

It will be noted the Commission has defined a legally qualified candidate as any person who has publicly announced that he is a candidate for nomination of a political party as well as election, who meets the qualifications prescribed by the applicable laws and who is either qualified for a place on the ballot or is eligible under applicable law to be voted for by sticker, write-in or other method. The Commission has made no study of the "applicable laws" to determine who could become eligible for the benefits of Section 315 as interpreted in the rule cited above. Such an analysis should be made of the various state and municipal election laws showing the various conditions necessary, respectively, to secure such benefits under Section 315.

The majority freely admit that the Commission has made no rules covering the specific situation; that there has been much confusion over this section; and that the licensee has no specific Commission rule to guide him. This is an admission that the Rules and Regulations are not adequate, and it is obvious that new rules should be adopted to guide all licensees in "any situation" which might occur under the section. The mandate for the Commission to make rules prescribed by Section 315 to cover specific situations that may arise under the Act is proscribed by Section 303(r) of the Act as follows:

"Make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this chapter . . . ."

Let us see if the dicta is inconsistent with Section 303(r) of the Communications Act when they hold that any and all candidates as defined by Section 315 and extended by Section 3.422 of the Commission's Rules and Regulations are free to broadcast anything and everything over the broadcast facilities of this country. Let us see how a subversive may take advantage of this concept of the majority. A legitimate candidate announces his candidacy for nomination for public office on the lawful party ballot of his true allegiance months in advance of the primary election and makes a broadcast concerning a public question which might become a leading issue in the campaign. A party which advocates the overthrow of the government by force and violence is denied a place on the ballot for its party column of candidates in certain states. A member of such illegal party could announce his candidacy at the same time for nomination to the same office on the ticket of a legally qualified party—the chance of success is immaterial. Such a candidate may not have, and knows that he does not have, a chance to be nominated, but he can still be a **bona fide** candidate under Commission Rules and Regulations, and demand time to say anything and everything advocated by the illegal party of his real affiliation. The latter candidate for the same office can demand and get an equal amount of time, even though such candidate may commit high treason by advocating the overthrow of our Government by force and violence. Under this concept a candidate may in his broadcast violate state election laws and the Federal Corrupt Practices Act, utter words of obscenity, profanity and vulgarism in violation of Section 326 of the Communications Act, or divulge information concerning lotteries which are violations under Section 316 of the Communications Act. It is easy to see how the unscrupulous candidate could use the ruling of the majority to bait labor and capital to foment race hatreds and use other subversive devices to divide our people.

The majority opinion holding that a candidate may broadcast anything and everything in his partisan political speeches is clearly inconsistent with Section 303(r) of the Communications Act in that it doesn't require candidates to abide by the law of the Communications Act as well as other applicable statutes, federal, state and local. Therefore, such "judicial legislation" exceeds the "rule-making powers" of the Commission. The reasoning of the majority opinion leads to absurdities and attributes to the Congress intentions wholly foreign to its thoughts and purposes. Certainly, a broadcast

by a qualified candidate for public office under existing law presupposes that such candidate will abide by all applicable laws and will, therefore, not commit libel, slander, treason or other high crimes and misdemeanors in high zeal or otherwise. To afford · political candidates a double standard whereby the ordinary citizen must abide by the law and a political candidate may break any law is a departure from fundamental principles of statutory construction that is far removed from public interest, convenience and necessity.

On the ruling of the majority opinion that the licensee is relieved from financial responsibility for libelous material broadcast by such candidates the Commission is denying redress to individual citizens of our country against broadcasting stations as joint libelers for libelous broadcasts of candidates which result in personal injury to them. Even if those issues were properly before us for decision rather than pronouncement of dicta, I consider it quite unnecessary and wholly undesirable for the Commission to find as a matter of existing law that a radio broadcast station is relieved by operation of Federal law from any responsibility for libelous material included in a political broadcast carried under Section 315 of the Act. This new legal principle and interpretation of basic law by the majority opinion will be binding upon the entire broadcast industry for an indefinite period of time. Although a number of authorities cited in the majority opinion seem to lend support to their obiter, no case full in point has ever been finally decided. It is reasonable to assume that many political campaigns will be held in the meantime and before the matter of liability is finally decided. Aside from damages to individuals and public institutions, who will suffer monetary damages of undeterminable amounts if the view of the Commission majority in this case is wrong?

I have grave doubts of the power of this Commission to deal with this subject matter by the regular rule-making procedure provided by the statute. The Commission exercises a regulatory function over those engaged in the business of transmitting intelligence by radio and wire. This regulatory function does not extend to the exercise of authority to deprive a private citizen of redress for personal injuries sustained as a result of a libelous broadcast. The Congress has not specifically invaded the field of civil and criminal liability of a licensee with reference to broadcasting. No specific authority is given to the Commission to create, extend, modify or invalidate State statutes and rights of citizens thereof, respectively. Until such time as the Congress might amend

the act, such determination should be left to the judicial branch of our State and Federal governments when parties are properly before them requiring an adjudication of their rights.

Slander and libel statutes, both civil and criminal, have been enacted by the several states, and civil and criminal actions based thereon fall within the State authority. Defamation by radio broadcasting has been defined as libel by the statutes of some states and as slander by the statutes of other states. The several states have afforded different rights of action for defamation limiting recovery in some cases to actual damage and extending recovery in other cases to punitive damages. A large group of states have statutes which provide that published retraction of defamation by the publisher thereof will mitigate the damages or limit the recovery to actual damages. Although the laws of the several states relating to defamation are not uniform, civil rights of action are granted to their respective citizens and in the absence of a specific invasion in the field by Congress and a specific authority given by Congress to this Commission to create, extend, modify or invalidate State statutes and the rights of citizens thereof, respectively, this Commission cannot act with reference thereto. The majority should consider the Tenth Amendment to the Constitution:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the States respectively, or to the people."

Therefore I conclude that the specifically delegated powers of this Commission cannot be stretched so that this servant of Congress can make such rules and regulations, much less assume to exercise such jurisdiction in a quasi-judicial proceeding.

Since the parties are not properly before us and the question is not one that is before the Commission for decision in this case, I conclude that the dicta of the majority that the broadcast licensee is relieved from responsibility for libelous material broadcast by political candidates within the meaning of Section 315 of the Act is oblique rule-making to guide all licensees hereafter wherein the Commission does not possess the power in the first instance to make such rules as a part of its rule-making powers and processes.

The Commission has advocated amendments of Section 315 of the Act to the Congress which would relieve the licensee

from liability for libel by candidates broadcasting under Section 315. So far Congress has chosen to let the Section remain the same. The majority opinion now enunciates in this proceeding and interpretation of the present Act on all fours with the language of the amendment it apparently felt necessary in the past to be made law by Congressional enactment to reach the results announced in their dicta. In the final analysis the enunciation of this dicta by the majority is oblique rule making and does not conform to the intent of Congress expressed in the Administrative Procedure Act. The Administrative Procedure Act provides for a public hearing before the agency of the government proposing rules and regulations wherein all parties to be affected thereby could have their day in court. All licensees to be governed thereby and the public would have the opportunity to appear, to present evidence, to controvert testimony and to file exceptions. All licensees should know the Commission view before a controversy involving broadcast operation under Section 315 of the Act occurs.

The issues of such a hearing would clearly be whether they are consistent with Section 315, 303(r), 316, 326, and other applicable law. A further issue might well be whether the Commission has the power under existing law to issue rules and regulations which amend, modify, repeal or invalidate rights granted under the statutes of the several states. These are questions, it seems to me, which are of paramount importance to be heard fully and completely before the broadcast industry is subjected to untold damages and before passive third persons have been made to suffer by unscrupulous and illegal conduct of candidates broadcasting anything and everything over the broadcast facilities of the nation in accordance with the majority opinion.

The industry and the public are entitled to hearings provided by the Administrative Procedure Act before the oblique rules of the Commission established in the dicta become law. Who will challenge the majority opinion? Surely not WHLS. It is told to go and sin no more—if it ever sinned. Since this case involves a grant of a renewal of license rather than the denial of one, it follows that there may never be a judicial review of this decision so that the licensees may be heard on these salient grounds. It is ironical that the Commission, the champion of fair play in the majority opinion enunciating "equal opportunity" under Section 315 of the Act, the publisher of the "Blue Book" guide to the industry to air both sides of controversial questions, should choose this

proceeding to govern the industry without first offering every licensee his chance to be heard. This method of governing the entire broadcast industry without giving all licensees the right to express their views is in my opinion an evil as serious as any the Commission is presuming to correct.

The Commission has taken over 2½ years to reach a decision in this case. WHLS has been on a temporary renewal basis 2 years during which time the doctrine of the majority opinion was advocated by the Commission as an amendment to the Act; failing adoption by the Congress, the majority now write this opinion which if unchallenged makes such amendment unnecessary. At this same time WHLS has promised to carry all political broadcasts even though the statute specifically provides none need be carried.

I see now where great injury may result from a procedure under which a licensee is obligated to operate his station for a long period of time under a temporary license while the Commission is deciding the issues in his case. The loss of his license is a death sentence to the operation of his station. During long pendency of his case he might well be willing to make any concession or promise that he thinks would satisfy any disfavor in which he might be held by the Commission.

Commissioners HYDE and JONES, concurring separately. Commissioner WEBSTER not participating.

